**MASSACHUSETTS PORT AUTHORITY**

v.

**The UNITED STATES.**

**No. 424–71.**

United States Court of Claims.

March 17, 1972.

Wilson D. Rogers, Jr., South Weymouth, Mass., attorney of record, for plaintiff.

Herman L. Fussell, Washington, D. C., with whom was Asst. Atty. Gen. Kent Frizzell, for defendant.

Before COWEN, Chief Judge, LARAMORE and DURFEE, Senior Judges, and DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

ON DEFENDANT'S MOTION TO DISMISS AND PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT

DURFEE, Senior Judge:

In 1956, the Commonwealth of Massachusetts (acting by and through the Port of Boston Commission) as lessee, and the United States Government (acting by and through the Department of the Army) as lessor, entered into a lease pertaining to the so-called "Boston Army Base." Section 2 of said lease provides:

> The Secretary of the Army shall provide for the repair and rehabilitation of such pier and other facilities to be leased hereunder at an overall cost of not to exceed Eleven Million Dollars ($11,000,000.00) and the Lessee agrees that ten percent (10%) of the estimated overall cost of such repair and rehabilitation, as such cost is determined by the Secretary of the Army, shall be paid by it as a condition to the execution and delivery of this lease agreement.

In accordance with the terms of Section 2 of the lease, the Commonwealth of

Massachusetts on September 5, 1956, tendered to the U. S. Government $1,100,000. This payment represented 10% of $11,000,000, the estimated cost of repair and rehabilitation of the pier and related facilities at the Army Base, as determined by the Secretary of the Army.[1]

On February 13, 1969, plaintiff (the Massachusetts Port Authority), who is the successor in interest to the rights of the Commonwealth of Massachusetts under the lease, received notice from the Department of the Army that all contractors' claims relative to the Boston Army Base project had been settled, and that the repair and rehabilitation work had been completed at a total cost of $10,536,957.59. Thus, the estimated cost of the project exceeded the actual cost by $463,042.41.

Plaintiff submitted to the Department of the Army a claim for refund in the amount of 10% of the excess of estimated cost over actual cost of the repair and rehabilitation work, or $46,304.42, together with interest at the rate of 6% from September 5, 1956. Plaintiff's claim was denied by the Comptroller General of the United States on January 26, 1971. Thereafter, on May 19, 1971, plaintiff petitioned this court for relief, praying for $46,304.42 plus 6% interest from September 5, 1956.

Plaintiff contends that the language of Section 2 of the lease is unclear and ambiguous; that its payment of 10% of the estimated cost was not consideration, but merely a condition precedent to the execution and delivery of the lease; that the language in Section 2 was included to insure that the parties' obligation to repair and rehabilitate the port facilities would in no event exceed $11,000,000; and that it

was the true intent of the parties that plaintiff pay, in partial consideration for performance under the agreement, 10% of the *actual costs* of the Boston Army Base Project.

Defendant, on the other hand, argues that the language of the lease, including Section 2, is complete and unambiguous and that, therefore, the intentions of the parties must be gathered solely from the language of the document. Defendant states further that the parties intended that plaintiff pay, in partial consideration for the lease, 10% of the *estimated costs* of repair and rehabilitation.

The lease itself cites, and is subject to Act of July 27, 1954, Pub.L.No. 534, § 103, 68 Stat. 535, 537–38, which authorizes the Secretary of the Army to lease the pier and other property comprising a part of the Boston Army Base for a term of 25 years, with the option of the Commonwealth to extend the term by one or more extensions for an additional 50 years. Section 103(b), pursuant to which an amount was to be determined as part consideration for execution of the lease, provides as follows:

(b) In order to carry out the purpose of this section, the Secretary of the Army shall provide for the repair and rehabilitation of such pier and other facilities to be leased hereunder, at an overall cost of not to exceed $11,000,000, but not less than 10 per centum of the estimated overall cost of such repair and rehabilitation, as such cost is determined by the Secretary of the Army, shall be paid by the Commonwealth of Massachusetts as a condition to the execution and delivery of such lease. The money so received from the Commonwealth of Massachusetts shall be used exclusively for the

1. According to a sworn affidavit submitted by defendant's project engineer, the Corps of Engineers hired the private firm of Faye, Spofford & Thorndike to determine the estimated cost of the necessary repair and rehabilitation work for the Boston Army Base. This firm estimated the cost to be $10,050,000, representing the cost for construction. However, this figure did not include expenses for contingencies and Government supervision during construction. These latter costs were estimated by the Corps of Engineers. The final tabulation of the two amounts was $11,000,000.

purpose of such repair and rehabilitation.

It is quite significant that subsection 103(b) of the authorizing act, which is reiterated almost verbatim in Section 2 of the lease, does not require a recomputation of the repair and rehabilitation contribution of the Commonwealth in the event of a variance between actual and estimated cost. This strongly indicates that such a provision was never bargained for, and that its omission from the lease was not a mutual mistake. We are inclined to believe, as did the Comptroller General, that the parties, guided by the authorizing act, did not intend to adopt such a recomputation provision as part of the lease.

Plaintiff contends that it paid 10% of the estimated cost of the project solely as a condition precedent, in order to satisfy the formal requirements of delivery which are necessary to sustain a valid contractual agreement. That is to say, plaintiff categorizes its payment as nothing more than a deposit which was to be held until such time as the actual cost of the project could be finally determined, and which was to be refunded in part in the event the estimated cost of the work exceeded the actual cost. However, the express language of the lease lends no support to plaintiff's position. Section 2 states, as quoted above, that the lessee agrees to *pay* "ten per cent (10%) of the *estimated overall cost* of such repair and rehabilitation * * *." [Emphasis supplied.] This language is clear and unambiguous calling for a direct payment of money, not a deposit, and it must be read, defined and interpreted strictly in accordance with the plain meaning of the words as they appear in the lease.

██ The arduous task of interpretation, be it of contract, lease, statute or other legal document is also perhaps the most delicate and potentially hazardous a court of law is called upon to perform. A slight change in meaning or emphasis or a slanted or narrow-sighted interpretation can oftentimes place the agreement of the parties, for which they freely and openly bargained, in danger of becoming distorted, onerous or empty. Our ultimate goal is always to give full force and effect to the expressed or implied intentions of the contracting parties, if such can be discerned, W. G. Cornell Co. v. United States, 376 F.2d 299, 309, 179 Ct.Cl. 651, 666 (1967), and only by defining the contract terms clearly, simply and in accordance with commonly accepted usage, can this paramount obligation be judiciously discharged. Hol-Gar Manufacturing Corp. v. United States, 351 F.2d 972, 976, 169 Ct.Cl. 384, 390 (1965); Breese Burners, Inc. v. United States, 121 F.Supp. 530, 535, 128 Ct.Cl. 649, 658–659 (1954). We will not, as plaintiff has attempted to do in the instant case, ascribe a meaning to the language of a lease which is neither stated, expressly or by implication, within the four corners of the document, nor supported by the factual context in which the lease was drawn and executed.

Plaintiff's counsel admitted at oral argument that, to his knowledge, there presently exists no documentary or testimonial evidence which might affirmatively establish the intentions of the parties, as they existed at the time of contracting. In the absence of such evidence, we must look to the language of the lease itself for presumably it embodies the intentions of the parties as they existed at the time the lease was drafted. In this particular instance, Section 2 of the lease requires plaintiff to *pay* 10% of the *estimated* cost of the project as determined by the Secretary of the Army, not 10% of the *actual* or ultimate cost as it was to be later determined.

Both parties to a Government contract presumably approach their undertaking with a reasonably clear understanding of the attendant complexities and consequences. Firestone Tire & Rubber Co. v. United States, 444 F.2d 547, 195 Ct.Cl. 21 (1971); Deloro Smelting and Refining Co. v. United States, 317 F.2d 382, 387, 161 Ct.Cl. 489, 497 (1963). Thus, in this case, it is perfectly logical to assume that both parties were well aware that the actual cost of a Government

project rarely, if ever, precisely equals the estimated cost. Armed with that knowledge and with the alleged expectation of some future monetary refund or recomputation, it would have been simple and expedient for plaintiff, at the time the lease was negotiated, to propose the addition of a refund or recomputation provision, and thereby insure the proper mechanism for the calculation and collection of plaintiff's expected return. We are reluctant to believe that although plaintiff contemplated a refund in the event estimated cost exceeded actual cost, it was nevertheless content to rest the disposition of said refund on the unstated intentions of the other contracting party, or on the uncertainties of a lawsuit. To the contrary, the more reasonable conclusion is that a recomputation was not proposed, nor was it intended that such a provision be included in the lease.

It should be noted, too, that the lease is not totally silent with respect to the possibility of a future refund of plaintiff's Section 2 contribution. Section 19(a) of the lease permits the lessor to reenter the property in the event of a national emergency or a declared state of war, and grants the lessee the option to terminate the lease or extend it for such period of time as the lessor may be in possession following any such reentry. Section 19(b) provides:

> (b) That in the event this lease is terminated as a result of such reentry during the initial twenty-five (25) year period of the lease, the Lessee shall be compensated for the ten per cent (10%) of the cost of repair and rehabilitation paid by it under Condition 2 hereof on the following basis; The Lessee shall be repaid the amount of such payment less one-third of one per cent (⅓%) of such amount for each month it is in possession under this lease.

Plaintiff contends that the wording of Section 19(b), i. e., "the Lessee shall be compensated for the ten per cent (10%)

of *the cost* of repair and rehabilitation * * * " [Emphasis supplied], leads inescapably to the conclusion that plaintiff's Section 2 payment was to be based ultimately upon 10% of the *actual* cost of the project. Plaintiff bases this conclusion upon the omission of the word *estimated* from the terms of Section 19(b). However, in our opinion, defendant correctly points out that the precise language of this section, i. e., "the Lessee shall be compensated for the ten per cent (10%) of the cost of repair and rehabilitation *paid by it under Condition 2 hereof* * * * " [Emphasis supplied], refers specifically to the amount paid by plaintiff under Section 2 which, as we have stated previously, requires plaintiff to pay 10% of the *estimated* cost of the project.

More importantly, Section 19(b) conclusively demonstrates that in certain instances, such as a national emergency or a declared state of war, the contracting parties intended plaintiff to be entitled to a Section 2 refund. We are persuaded that if the parties provided for this type of refund in the event of a national emergency, which, no one will dispute, is a factual situation extremely more speculative than a variance between actual and estimated cost in a Government construction project, then they would have provided for a similar refund or recomputation upon condition of a cost variance, if that had been their intention.

We conclude that plaintiff's payment of 10% of the estimated cost of the repair and rehabilitation work for the Boston Army Base Project, under Section 2 of the lease, was partial consideration, properly bargained for by competent parties at arms-length, for overall performance under the lease agreement. For the foregoing reasons, we hold that defendant's interpretation of the pertinent lease provisions was reasonable and proper under the circumstances presented in this case. It follows that plaintiff is not entitled to a refund of its contribution, notwithstanding that the esti-

mated cost of the project well exceeded the actual cost by over $463,000.

Accordingly, plaintiff's cross motion for summary judgment is denied. Defendant's motion to dismiss is granted, and the petition is dismissed.