**CITY OF OXNARD, Appellant,**

v.

**The UNITED STATES, Appellee.**

**Appeal No. 87–1638.**

United States Court of Appeals, Federal Circuit.

July 6, 1988.

James J. Gallagher, McKenna, Conner & Cuneo, Los Angeles, Cal., argued, for appellant. With him on the brief, was John G. Stafford, Jr.

Gordon D. Kromberg, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued, for appellee. With him on the brief, were Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director and Thomas W. Petersen, Asst. Director. Also on the brief, was Richard A. Gallivan, Office of General Counsel, Dept. of the Navy, of counsel.

Before FRIEDMAN and NEWMAN, Circuit Judges, and BENNETT, Senior Circuit Judge.

PAULINE NEWMAN, Circuit Judge.

We affirm the decision of the Armed Services Board of Contract Appeals [1] denying the claims of the City of Oxnard for payment, on behalf of the Department of the Navy, of a share of the cost overruns incurred by Oxnard in performance of Contract Nos. N62474–76–C–6511 and N62474–76–C–6512.

## Discussion

In accordance with the contracts, Navy installations at Port Hueneme, California and Point Mugu, California would be connected to Oxnard's sewer service lines and waste water treatment facilities, requiring inter alia the construction of adequate connections and the upgrading of Oxnard's regional waste water treatment plant. The two contracts provided that the Navy would pay a designated "Connection Charge", which was a share of the total construction costs. The Connection Charge

---

1. *City of Oxnard v. United States,* ASBCA Nos. 30344 and 30351 87–2 BCA ¶ 19,901 (May 22, 1987) [available on WESTLAW, 1987 WL 41250]. This appeal was taken pursuant to the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (1982 & Supp. III 1985).

was described in the contracts as "not to exceed" a stated amount.[2]

Oxnard asserts that the mutual intent and understanding was that the Navy would pay a proportionate share of the total actual costs, and that Navy representatives orally so assured Oxnard as it became apparent, during the course of construction, that the costs would exceed the estimates on which the Navy's share was calculated. The Navy's position is that it never gave such assurances, that such assurances if given were unauthorized and therefore of no effect, that the written contract must prevail, and that Navy representatives told and wrote Oxnard that the "not to exceed" price was the government's maximum liability. Oxnard replies that persons representing the Navy told them that "not to exceed" clauses were always included in Navy contracts, but that the Navy would pay its fair share and when the project was finished the Navy would request any necessary additional funds. The Navy ultimately refused to pay a share of the increased costs.

Witnesses on both sides testified in support of their respective positions. The Board found credible the denial of the Navy's representative that she had given the assurances attributed to her, and placed weight on various letters from Navy contracting officials, written in connection with change orders and progress payments and expressly stating that the "not to exceed" price was the maximum commitment. Such correspondence spans several years, and is illustrated as follows:

> Letter dated May 10, 1978 from Sukeo Oji, Head, Commercial Utilities Branch, Western Division, Naval Facilities Engineering Command: to the Director of Public Works of the City of Oxnard:
>
> > Your attention is called to the requirement that total construction costs, in-cluding all change orders previously effected and the instant change order in the sum of $421,101, shall not exceed $1,649,796.

> Letter dated March 13, 1979 from C.C. Hoffner, Jr., Director, Utilities Division (Navy) to the Oxnard Director of Public Works:
>
> > Your attention is called to the requirement that total costs, including all change orders (amendments) shall not exceed $1,649,796 under Contract N62474–76–C–6512 and $538,319 under Contract N62474–76–C–6511.

> Letter dated July 25, 1980 from Commander J.D. Kunz, Head, Facilities Management Department, to the Oxnard Director of Public Works:
>
> > In any event, the Government's total liability for all construction costs under Contracts N62474–76–C–6511 and N62474–76–C–6512, including contract contingencies, shall not exceed $538,319 and $1,649,796, respectively.

The record also shows that on January 29, 1981 the Finance Director of Oxnard wrote to Sukeo Oji, expressing the same position now pressed, that the Navy had agreed to share the higher construction costs:

> The second issue relates to costs of construction above those originally budgeted for in the contract. We have been told that at such time as construction is complete, the Navy will approach Congress to request appropriation for the Navy's proportionate shares of the construction overruns.

In answer to this letter Mr. Oji again referred to the "Connection Charge" clause in the contract, and wrote:

> the Government is required to pay a proportionate share of the actual cost but *not to exceed* the amount committed by the Navy in the contract. [emphasis in original].

---

**2.** Illustrative is Contract–6511, which provides as amended:

> 8. CONNECTION CHARGE
> (a) *Charge.* In consideration of the agreements of the Contractor set forth in subparagraph (b) below, the Government shall pay to the Contractor the sum not to exceed $538,319. The sum of $497,680 shall be paid within 60

days.... The balance of the aforementioned sum is to be distributed in accordance with subparagraph (c) below....
(c) *Change Orders.* ... The Government's total liability for all construction costs, including contract change orders for the item aforesaid shall not exceed $538,319 as shown in (a) above....

There is no written representation as to additional funds. Although Oxnard's officials testified as to their belief that Oxnard would be proportionately reimbursed for overruns, the Board concluded that the evidence presented by Oxnard was outweighed by the unambiguous written contracts and the consistent written communications from the contracting officials of the Navy. The Board was not persuaded that the conversations to which Oxnard referred could and did vary the express contract terms. The Board held that the Navy had no obligation to pay more than the "not to exceed" prices stated in the contracts.

■ Oxnard argues that the Navy is estopped from taking the position that it did not agree to pay a proportionate share of the actual cost of construction. Estoppel may be applied against the government in appropriate circumstances, *see American Electronic Laboratories v. United States,* 774 F.2d 1110, 1113 (Fed.Cir.1985) (Army estopped from invoking a limitation of funds clause when contractor's continued performance was in reasonable reliance on the repeated statements of Army representatives that additional funds would be forthcoming); *Thanet Corp. v. United States,* 591 F.2d 629, 635 (Ct.Cl.1979); *cf. Law Mathematics and Technology, Inc. v. United States,* 779 F.2d 675, 678 (Fed.Cir. 1985) (Navy not estopped from invoking a limitation of funds clause when Navy had not promised funds beyond the amount specified in the contract and the contractor had not relied reasonably on such promise to its detriment).

In pressing the theory of estoppel Oxnard relies particularly on the audit report of the Defense Contract Audit Agency. This report was made shortly after the contracts were entered into, and states that the Navy's share was "computed as a ratio of the reserved capacity to the total capacity". This report is in accord with other evidence as to how the not-to-exceed prices were calculated, but it does not add weight to Oxnard's position that the government intended not to be bound by the not-to-exceed prices set in the contracts, or that the government led Oxnard to believe that these prices were not binding. (This report

corrected a calculation error and resulted in a contract amendment decreasing the not-to-exceed total. No subsequent amendments to this total were made.)

We affirm the Board's holding that estoppel has not been shown.

■ The Board also considered the question of whether the written contracts stated the intent of the parties. In ascertaining the actual contractual intent when one of the parties asserts that the mutual intent was different from that shown in the written word, we apply classical principles of contract law, as summarized in 4 *Williston On Contracts* § 610 (W. Jaeger 3d ed. 1961):

> [I]f the parties have made a memorial of their bargain, or a writing is required by law, their actual intent unless expressed in some way in the writing is ineffective, except when it can be made the basis for reformation of the writing. [footnotes omitted]

The subjective intent of one of the parties, if contrary to the unambiguous and reasonable text of the written contract, is not a basis for reforming the contract. *See, e.g., Dana Corp. v. United States,* 470 F.2d 1032, 1041 (Ct.Cl.1972). A party contesting the reasonable construction of contract language must show either that both parties had a contrary intent, or that the party seeking relief had no reason to know of that reasonable construction at the time of making the agreement. *L.S.S. Leasing Corp. v. United States,* 695 F.2d 1359, 1364 (Fed.Cir.1982).

■ While the Navy does not dispute that the Connection Charges set in the contracts were calculated as a percentage of the total estimated costs, the final contracts do not obligate the Navy to pay a percentage of the total costs. Instead, the contracts state a specific dollar amount, and a specific 10% contingency, totaling a not-to-exceed dollar amount. The Navy emphasizes that this contingency of 10% above the estimated costs shows the contractual intent and mutual understanding that the Navy had limited its obligation to contribute to cost overruns. We conclude,

as did the Board, that this plain reading of the contract is more reasonable than Oxnard's position that the not-to-exceed prices were only "funding control devices".

The contracts are not inherently ambiguous, and are not reasonably susceptible of an interpretation that is at odds with their text. Accepting Oxnard's recital of the circumstances attendant the making of the contract, Oxnard has not demonstrated that the parties intended to write an agreement different from the one they wrote. *See generally* 4 Williston §§ 610A, 610B. In this professional drafting of detailed contracts, our predecessor Court's analysis in *Massachusetts Port Authority v. United States,* 456 F.2d 782, 784 (Ct.Cl.1972) remains apt:

> [I]t is perfectly logical to assume that both parties were well aware that the actual cost of a Government project rarely, if ever, precisely equals the estimated cost.... [I]t would have been simple and expedient for the plaintiff, at the time the lease was negotiated, to propose the addition of a refund or recomputation provision ... We are reluctant to believe that although plaintiff contemplated a refund in the event estimated cost exceeded actual cost, it was nevertheless content to rest the disposition of said refund on the unstated intentions of the other contracting party, or on the uncertainties of a lawsuit.

(citations omitted). *See also ITT Arctic Services, Inc. v. United States,* 524 F.2d 680, 684 (Ct.Cl.1975).

Oxnard's position that it viewed the not-to-exceed clauses as "boiler plate" and placed controlling reliance on a post-contact report and oral assurances, is not a reasonable view of the contractual relationship.

> Both parties to a government contract presumably approach their undertaking with a reasonably clear understanding of the attendant complexities and consequences.

*Massachusetts Port Authority,* 456 F.2d at 784. Although the record suggests that one Navy official, at least, thought that the Navy *ought* to pay a share of the increased costs, Oxnard has not shown a basis in law for judicial reformation of the contracts.

The judgment of the Armed Services Board of Contract Appeals is

AFFIRMED.