**TOWN OF PORT DEPOSIT, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 297–87C.**

United States Claims Court.

July 31, 1990.

John Amato, IV, Baltimore, Md., for plaintiff. John T. Enoch, Goodman, Meagher & Enoch, of counsel.

Cynthia D. Walicki–Chan, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant. Carolyn E. Galbreath, on the briefs.

## OPINION

NETTESHEIM, Judge.

This case is before the court on cross-motions for summary judgment. Argument was held prior to the case's being reassigned to this judge. The issue for decision involves the allowability of depreciation and a fair rate of return on equity in a contract to supply water to a government agency.

## FACTS

The following material facts are undisputed, unless otherwise noted. The United States acquired through condemnation proceedings in 1942 and 1943 approximately 1100 acres of land, partly within and partly adjacent to the Town of Port Deposit, Maryland ("plaintiff"). A written agreement dated March 24, 1943, between the Department of the Navy (the "Navy") and plaintiff provided that construction of the Naval Training Center Bainbridge (the "NTC") on this land interfered with plaintiff's natural water supply. The agreement, as modified by an amendment of June 17, 1944, required the Navy to furnish an amount of water, not to exceed 300,000 gallons daily, to plaintiff from the NTC's newly constructed water supply facilities. In addition, the agreement required that the Navy, upon discontinuance of the use and operation of the NTC and its water plant, restore the natural water supply to plaintiff at two locations, free from any pollution attributable to activities of the Navy.

By April 1982 the Navy determined that the NTC was in excess of the Navy's needs and that it should dispose of the property. However, the Department of Labor ("Labor") desired to continue operation of the Chesapeake Job Corps Center on a portion of the property. On April 14, 1982, plaintiff entered into two agreements, one with the Navy and one with Labor. A provision in the agreement with the Navy obligated the Navy to pay plaintiff $2,700,000.00, "plus the cost to the TOWN of such NTC Bainbridge lands conveyed for construction and operation of a new water plant." This payment was to be in full settlement of all obligations, costs, and claims arising out of the 1943 agreement and out of the condemnation, operation, and use of the former NTC by the Navy. The agreement with the Navy also included a clause that plaintiff would provide water to Labor.

The second agreement dated April 14, 1982, between plaintiff and Labor established the amount of water that would be supplied to Labor by plaintiff and the rate that would be charged for the water. The relevant provisions in this agreement are the following:

## POINT OF DELIVERY

VI. The water system shall include a pipe leading from the TOWN water tank located on the aforesaid one acre parcel of land to LABOR'S system. The point where the pipe connects to the tank shall hereinafter be called the point of delivery.

All *replacement costs and all operation, maintenance, and energy costs* to operate the water system from the intake lines in the Susquehanna River to the point of delivery shall be the full responsibility of the TOWN.

All *replacement costs and all opera-tion, maintenance, and energy costs* to operate the system from the point of delivery (excluding the meter) and beyond shall be the full responsibility of LABOR, payment for which shall be made by LABOR as hereinafter provided.

. . . .

## BILLING AND PAYMENT

VIII. TOWN shall bill LABOR monthly a fixed sum of Three Thousand One Hundred Fifty Dollars ($3,150.00) for services to the point of delivery rendered hereunder. For such sum the TOWN shall deliver to LABOR a quantity of water monthly not to exceed 3,150,-000 gallons of water. In the event that Labor should demand and need more water, the TOWN shall, [sic] deliver additional water for LABOR at the rate of One Dollar ($1.00) per each thousand gallons of additional water delivered to the point of delivery. LABOR shall pay monthly bills on receipt thereof by LABOR at the TOWN'S office in Port Deposit, Maryland.

## ESCALATION

IX. The rates established in Paragraph VIII, including the fixed sum, are based on estimated *operation, maintenance, and energy costs.* In the event that such estimated costs may increase or decrease during the interim period from the date of this Agreement until the effective date of this Agreement, a new rate may be established. If a new rate is established, the fixed sum shall be adjusted proportionately.

After the effective date of this Agreement, LABOR agrees to pay a rate increase based on LABOR'S proportionate share of any increases in *operation, maintenance, and energy costs.* If a new rate is established, the fixed sum shall be adjusted proportionately. TOWN shall provide to LABOR supporting documentation to justify such rate and fixed sum increases.

(Emphasis added.)

Labor, in a supplemental agreement with the Navy dated September 28, 1982, agreed to pay the Navy $527,000.00 as a contribution to the cost of the water plant that would be built by plaintiff to provide for both its needs and Labor's needs.

Both agreements of April 14, 1982, did not define "operation costs." * No evidence has been offered that the term was discussed or that the subjects of depreciation or return on capital were broached before the contract was finalized. However, during negotiations plaintiff's consulting engineers sent Labor a detailed estimate of operation costs for the water system that plaintiff proposed to construct. The proposed operating costs included "$13,000 or 10.3¢/1,000 Gal." for "Reserve."

After signing the April agreements with the Navy and Labor, plaintiff proceeded to construct a water treatment facility which became operational in May 1985. Plaintiff billed Labor for the period of May 19, 1985, to June 30, 1985, at a rate of $1.57 per 1,000 gallons of water. Labor wrote to plaintiff and stated that a payment would be made to plaintiff at the rate of $1.00 per 1,000 gallons of water, the rate established in the agreement of April 14, 1982, and that a new rate would be negotiated once Labor acquired sufficient documentation of actual costs.

Subsequently, plaintiff provided Labor with an account of operating costs that showed the cost of producing water to be $1.99 per 1,000 gallons of water. Included as a cost was an item labeled "Reserve". Plaintiff documented the $60,659.08 for Reserve as a year's depreciation.

---

* The parties dispute how much of the second agreement was drafted by Labor. Plaintiff supplies an affidavit of its counsel attesting that the task was shared equally by the parties; defendant relies on the deposition testimony of Donald N. Poist, Sr., Mayor of plaintiff, to the effect that plaintiff's attorneys were the sole drafters. This disputed fact is not material, as plaintiff would be entitled to invoke the doctrine of *contra proferentem* (whereby ambiguity in agreement is interpreted against its drafter) only if Labor drafted the contract.

After receiving plaintiff's account of operating costs and meeting with plaintiff to discuss the water rate to be charged, Labor, in its letter to plaintiff dated October 4, 1985, suggested that it pay an interim rate of $1.57 per 1,000 gallons of water. The interim rate was to remain in effect until certain issues, including the amount attributable to Reserve, were resolved. Plaintiff rejected this interim rate in its letter to Labor of October 24, 1985. In a subsequent letter of December 3, 1985, plaintiff stated that it should add to Reserve an additional $242,636.33 per year to allow for a fair rate of return on equity capital. Labor's responsive January 21, 1986 letter stated that neither depreciation nor a return on equity capital properly could be included in the water rate. Labor based its conclusion upon Office of Management and Budget Circular No. A–87, "Cost Principles for State and Local Governments" ¶ 11 (1981), 41 C.F.R. § 1–15.711–11 (1984). The regulation provides, in pertinent part:

(a) Grantees may be compensated for the use of buildings, capital improvements, and equipment through use allowance or depreciation. Use allowances are the means of providing compensation in lieu of depreciation or other equivalent costs. However, a combination of the two methods may not be used in connection with a single class of fixed assets.

(b) The computation of depreciation or use allowance will be based on acquisition cost. Where actual cost records have not been maintained, a reasonable estimate of the original acquisition cost may be used in the computation. The computation will exclude the cost or any portion of the cost of buildings and indirectly by the Federal Government equipment donated or borne directly or through charges to Federal grant programs or otherwise, irrespective of where title was originally vested or where it presently resides.... [sic]

41 C.F.R. § 1–15.711–11. Plaintiff and defendant both agree that this last sentence should read: "The computation will exclude the cost or any portion of the cost of buildings and equipment donated or borne directly or indirectly by the Federal Government through charges to Federal grant programs, or otherwise, irrespective of where title was originally vested or where it presently resides...." Plf's Br. filed Sept. 27, 1989, at 4; Def's Br. filed Sept. 12, 1989, at 12.

In a letter dated March 3, 1986, plaintiff stated that if Labor would accept the $60,659.08 as the Reserve amount, plaintiff would delete the fair rate of return on equity capital. Plaintiff also stated that it was willing to accept a water rate of $1.93 per 1,000 gallons of water. Plaintiff advised in a letter of May 22, 1986, that Reserve had been reduced to $54,805.12 by plaintiff's deleting all grant monies from its expenditures.

With the hopes of securing $40,000.00 still held by Labor, plaintiff's Mayor Donald N. Poist, Sr., in the May 22 letter, invited Labor officials to review the water system budget and to renew negotiations with plaintiff:

We trust that you will personally take a more active [role] in resolving the financial differences that exist between our two sides. It is beyond our imagination how your associates can entertain the idea that the transaction between the Town of Port Deposit and the Department of the Navy involved any grant monies whatsoever. The Navy doesn't support your position nor do I believe does Mr. Saile of the DOL.

On May 27, 1986, the Contracting Officer issued a final decision establishing a water rate of $1.43 per 1,000 gallons of water, effective May 25, 1985. In arriving at the $1.43 rate, the Contracting Officer disallowed the amount attributable to Reserve in plaintiff's budget. The Contracting Officer disallowed the Reserve costs on the grounds that Office of Management and Budget Circular No. A–87, ¶ 11, did not permit plaintiff's recovery of depreciation:

This rate disallows the costs associated with Item O Reserve of your justification of costs breakdown. This disallowance is based upon paragraph II of the Office of Management and Budget Circular No.

A–87, titled "Cost Principles for State and [L]ocal Governments," a copy of which you were previously furnished. The final decision did not address the subject of return on equity. This decision was challenged by plaintiff in a complaint filed in the Claims Court on May 26, 1987.

## DISCUSSION

The issue is whether the contract between Labor and plaintiff requires Labor to pay plaintiff for depreciation and a fair rate of return on equity capital. Plaintiff and Labor disagree over the meaning of the term "operation costs," as it appears in the Escalation clause of their agreement of April 14, 1982. Plaintiff argues that the term comprehends depreciation and a fair rate of return on equity capital, while defendant argues the contrary.

### 1. *Summary judgment standards*

Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. RUSCC 56(c). Only genuine disputes over material facts, or facts that might affect the outcome of the suit under the governing law, preclude an entry of judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine if the evidence would permit a reasonable jury to return a verdict in favor of the non-movant. 477 U.S. at 248, 106 S.Ct. at 2510. Both plaintiff and defendant, as the moving parties, have the burden of establishing that there are no genuine material factual issues in dispute and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In the capacity of opposing each other's motion, plaintiff and defendant have the burden of providing sufficient evidence, not necessarily admissible at trial, to show that a genuine issue of material fact indeed exists. *Celotex*, 477 U.S. at 322, 324, 106 S.Ct. at 2552, 2553.

To create a genuine issue of fact, the non-movant must do more than present *some* evidence on an issue it asserts is disputed. The Court stated:

> [T]here is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence [of the nonmovant] is merely colorable, or is not significantly probative, summary judgment may be granted....

*Avia Group Int'l, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1560 (Fed.Cir. 1988) (emphasis in original) (quoting *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (citations omitted), and citing *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53, and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)).

In resolving the cross-motions, the court cannot weigh the evidence on summary judgment and determine the truth of the matter. *Anderson*, 477 U.S. at 249, 255, 106 S.Ct. at 2510, 2513. Any evidence presented by the opponent is to be believed, and all justifiable inferences are to be drawn in its favor. *Id.* at 255, 106 S.Ct. at 2513. Uncontested material facts also have been found consistent with the rule that, in respect of any facts that may be considered as contested, each party, in its capacity as the opponent of summary judgment, is entitled to the benefit of "all applicable presumptions, inferences, and intendments." *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

Summary judgment pursuant to RUSCC 56 properly can intercede and prevent trial if the movant can demonstrate that trial would be useless in that more evidence than is already available in connection with its motion could not reasonably be expected to change the result. *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 626 (Fed.Cir.1984). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut but, rather, as an integral part of the Federal Rules as a whole, which are designed 'to secure the

just, speedy and inexpensive determination of every action.... ' " *Celotex*, 477 U.S. at 327, 106 S.Ct. at 2555 (quoting Fed.R.Civ.P. 1) (quoted in *Avia Group Int'l*, 853 F.2d at 1560, and *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed.Cir. 1987)).

> Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Celotex*, 477 U.S. at 327, 106 S.Ct. at 2555; *see also Universal Life Church, Inc. v. United States*, 13 Cl.Ct. 567, 580 (1987) (citing cases), *aff'd*, 862 F.2d 321 (Fed.Cir. 1988) (Table). A trial court may deny summary judgment, however, if "there is reason to believe that the better course would be to proceed to a full trial." *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513. (citation omitted).

### 2. *Applicability of cost principles*

■ Defendant asserts that there is no dispute between the parties that funds transferred under the settlement agreement, from the Navy and Labor to plaintiff, were used to build the water system. Under such circumstances, defendant argues, the Cost Principles for State and Local Government present a bar to charging Labor for depreciation. Plaintiff rejoins that the money transferred under the agreement was not a "grant" of federal funds, but, rather, represented satisfaction of the Navy's pre-existing obligation to provide water service to plaintiff. Plaintiff's counsel contended at argument that were defendant's position accepted, plaintiff would never be able to charge depreciation costs to a federal entity if plaintiff also was receiving federal funds—no matter how remote the source:

> [I]f you carry Labor's argument to their logical conclusion, you could have a situation where the town of Port Deposit sold NASA rocket fuel and they paid, NASA paid the town of Port Deposit $2.7 million for rocket fuel if they could earmark that money some way and then show that the town used that $2.7 million to build a water plant, that we couldn't charge them depreciation on the water plant because the money came from the Federal Government. That's obviously not what the OMB circular had in mind.

Transcript of Proceedings, No. 297–87C (Cl.Ct. June 1, 1990), at 19 [hereinafter "Tr."]. Plaintiff's counsel conceded, however, that Labor's contribution to the project of $527,000.00 appears more like a grant than the funds from the Navy and invited the court to discount any depreciation on pro-rata basis. Plaintiff's invitation is accepted.

The hypothetical offered by plaintiff is inapposite. It necessarily assumes that plaintiff was free to spend the proceeds from the settlement agreement in any manner that it wished and simply chose to spend it on a water plant that would serve the needs of both plaintiff and Labor. The terms of the settlement agreements executed April 14, 1982, are at odds with this view. Under the 1982 agreements, the Navy would provide funds in consideration of plaintiff's providing water for itself and Labor. The preamble to both agreements stipulated:

> WHEREAS, the TOWN plans to construct or otherwise provide replacement source of potable water to supply its needs and those of the Department of Labor's....

> WHEREAS, the UNITED STATES has agreed to pay the TOWN the sum of Two Million Seven Hundred Thousand Dollars ($2,700,000.00), plus the cost to the TOWN of such NTC Bainbridge lands conveyed for construction and operation of a new water plant....

> It being the intention of the parties hereto that the UNITED STATES wishes to provide the TOWN with sufficient land and easements to construct or otherwise provide a replacement source of potable water to supply its needs as aforesaid.

WHEREAS, the United States of America, acting by and through the Department of the Navy, hereinafter called NAVY, is providing funds to the TOWN for the design and construction of LABOR's new supplemental waters system as described above....

WHEREAS, TOWN is willing to install the supplemental water system for LABOR; and

WHEREAS, TOWN shall supply LABOR with water as hereinafter provided....

In brief and in oral argument, plaintiff demonstrated that it understood that the money it received in settlement was to pay for construction of a water plant to supply the water needs of Labor and itself. In brief plaintiff stated, "[I]ncluded within the $2,700,000.00 payment to the Town was a sum of $527,000.00 in order to build a plant large enough to supply not only the Town's water needs, but that of the Job Corps Center as well...." Plf's Br. filed Sept. 27, 1989, at 5. In oral argument counsel stated:

[S]omebody came up with the idea, we want to operate the Chesapeake Job Corps Center and we want you to build a plant large enough to service not only your own needs, but the needs of the Chesapeake Job Corps Center. And, therefore, the Department of Labor kicked-in an additional $527,000 and made the total payment, instead of $2.1 something, made the total payment $2.7 million and enabled the town to build a plant that was not only large enough to service its own needs, but large enough to [service] the needs of the Chesapeake Job Corps Center.

Tr. at 18.

Providing water to the Chesapeake Job Corps Center was an important contractual objective to the Navy. As shown in correspondence between Leon Kahn, Director of Real Estate Operations and Natural Resources Division of the Navy Facilities and Engineering Command, and Charles Atkinson, Acting Administrator of the Job Corps, the Navy sought Labor's cooperation in achieving a settlement that provided for each agency's needs. For example, in his letter of July 16, 1982, a Navy representative stated:

Your prompt determination on this matter is urgently requested, since the only feasible alternative for the Navy, if this is not acceptable to you, is for the Navy to enter into a separate agreement with the Town to include the Town's requirements only.

Moreover, in a September 28, 1982 supplemental agreement between Labor and the Navy, the Navy assigned Labor rights and remedies against the Town "in the event, for any reason, the Town of Port Deposit is not capable of or does not furnish water to the Department of Labor...." Under the supplemental agreement, Labor's recovery on claims against the Town was limited to the amount of its $527,000.00 contribution. The evidence of record shows that it was the parties' intention that settlement funds be used to construct a water plant to supply Labor's water requirements.

The Cost Principles state that depreciation shall be based upon "acquisition costs" minus any Federal contribution. In this manner agencies that contribute to the development of facilities are not "double-charged"—once for the initial capital investment and again in the form of a levy for annual depreciation. To the extent that the acquisition costs of developing the plant were attributable to Federal funds, Labor should not be required to bear the added expense of a depreciation cost.

The infirmity in defendant's position is that the funds contributed by the Navy were obligated by the pre-existing legal obligation imposed in the June 17, 1944 amendment to the original 1943 agreement between plaintiff and the Navy. Defendant does not make a convincing argument that payment of funds for a dedicated purpose pursuant to a pre-existing legal obligation comes within the scope of what the Cost Principles envisioned as an indirect payment. What defendant may be able to prove is that the amount paid by the Navy exceeded that which the 1943 agreement, as amended, reasonably contemplated for restoration to plaintiff of the natural water

supply at two locations. The Cost Principles would disallow depreciation to be taken on any such differential, as well as the amount contributed by Labor.

### 3. *Jurisdiction over return on equity claim*

■ In its final brief, defendant argued that plaintiff's claim for a fair rate of return on equity had not been submitted to the contracting officer and, hence, that jurisdiction did not lie to consider it. The problem raised by the timing of defendant's jurisdictional argument is subtle and too frequently not represented accurately on appeal. As acute as the court must be to guard its jurisdiction against trespass, the Government is not entitled, without some excuse, to make the argument on reply after plaintiff had filed its last brief when defendant could have made the argument in its moving brief. The court has discretion to decide a dispositive motion on the basis of the matters that have been fully briefed when the briefing cycle closes. To allow a cross-movant to suggest a new argument in its closing brief, when all the facts and documentary evidence were available at the time the initial brief was filed, demeans the role of advocacy. In this case, moreover, defendant's reply questions jurisdiction, but fails to supply the documents unquestionably in its possession (plaintiff's claim letters), that would permit the court to rule without another full round of briefing. The integrity of the litigation process deserves more.

Plaintiff made the following statement:

The Town during pre-filing negotiations of this dispute, pursued only its right to recover its depreciation cost, not its right to a return on its equity investment. This was done in the spirit of compromise and negotiation, if it would resolve the matter without litigation. Because the Government has refused to pay even the depreciation allowance, the Town in this litigation now makes claim to both depreciation cost and a return on its equity investment....

The fact that the Town, in the spirit of negotiation and compromise, omitted a claim for return on capital investment from its budget, does not change the fact that even the consequently lower figure submitted was rejected by the contracting officer. Accordingly, the Town can make claim for all it can legally justify as an operating cost....

Plf's Br. filed Sept. 27, 1989, at 7–8. This statement apparently spawned defendant's new argument.

41 U.S.C. § 605(a) (1988) provides, in pertinent part: "All claims by a contractor against the Government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision...." *Contract Cleaning Maintenance, Inc. v. United States*, 811 F.2d 586, 590 (Fed.Cir.1987); *Thoen v. United States*, 765 F.2d 1110 (Fed.Cir.1985); *W.M. Schlosser Co. v. United States*, 705 F.2d 1336 (Fed.Cir.1983); *W.H. Moseley Co. v. United States*, 230 Ct.Cl. 405, 677 F.2d 850 *cert. denied*, 459 U.S. 836, 103 S.Ct. 81, 74 L.Ed.2d 77 (1982). It appears that plaintiff did not submit to the contracting officer a clear and unequivocal statement that plaintiff was making a claim for a rate reflecting a return on equity. However, since defendant moved against this claim on the merits, the issue has been briefed fully, and defendant has established its entitlement to judgment as a matter of fact and law, the claim will be resolved without further briefing.

### 4. *Meaning of "operation costs" and claim for a return on equity*

■ In reading contract provisions, the court's purpose is to " 'give full force and effect to the expressed or implied intentions of the contracting parties, if such can be discerned.' " *Truong Xuan Truc v. United States*, 212 Ct.Cl. 51, 66 (1976) (quoting *Massachusetts Port Auth. v. United States*, 197 Ct.Cl. 721, 726, 456 F.2d 782, 784 (1972)); *see also SCM Corp. v. United States*, 230 Ct.Cl. 199, 203, 675 F.2d 280, 283 (1982); *Honeywell Inc. v. United States*, 228 Ct.Cl. 591, 596, 661 F.2d 182, 186 (1981); *Dynamics Corp. of America v. United States*, 182 Ct.Cl. 62, 72, 389 F.2d 424, 429 (1968). To discover their inten-

tions the court will read the contract as a whole, ascribing to the contract language its ordinary and commonly accepted meaning, unless it is shown that the parties intended otherwise. *Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 390, 351 F.2d 972, 976 (1965) (citing cases). Thus, in the absence of clear evidence indicating a contrary intention between the parties, the plain and unambiguous meaning of a written agreement will control. *See George Hyman Constr. Co. v. United States*, 832 F.2d 574, 581 (Fed.Cir.1987) (court would not "rewrite the contract" where the plain meaning of the terms was unambiguous); *Thanet Corp. v. United States*, 219 Ct.Cl. 75, 82, 591 F.2d 629, 633 (1979) (contract language is interpreted so as to give effect to the plain and ordinary meaning of words).

Plaintiff cites several cases for the proposition that depreciation is within the ordinary and commonly accepted meaning of the term "operation costs." In both *City of Knoxville v. Knoxville Water Co.*, 212 U.S. 1, 29 S.Ct. 148, 53 L.Ed. 371 (1909), and *Lindheimer v. Illinois Bell Tel. Co.*, 292 U.S. 151, 54 S.Ct. 658, 78 L.Ed. 1182 (1934), the Supreme Court examined whether government-established utility rates were so low as to amount to taking of property without "just compensation." In each case, the Court remarks that in establishing fair utility rates, amounts should be budgeted for replacement of depreciating assets. In *Fairbanks, Morse & Co. v. City of Wagoner*, 81 F.2d 209 (10th Cir.1936), the Tenth Circuit considered whether depreciation costs were properly chargeable as part of the utility's contract with the defendant city. The *Fairbanks* court ruled both that the contract between the parties was valid and that depreciation was properly chargeable to the utility's customers. "It is well settled by works on accounting and by accepted accounting practices, that depreciation is an operating cost or expense...." 81 F.2d at 219; *see also Arkansas Louisiana Gas Co. v. City of Texarkana* 96 F.2d 179, 187 (8th Cir.), *cert. denied*, 305 U.S. 606, 59 S.Ct. 66, 83 L.Ed. 385 (1938) (Depreciation should be allowed as an operating expense. The amount allowed is "the amount reasonably necessary to maintain the pipes and mains at the required standard of efficiency...."); *City of Waterville v. Kennebec Water Dist.*, 138 Me. 307, 25 A.2d 475, 481 (Me.1942) (The distinction between current maintenance expenses and depreciation is theoretically clear, however "a difficult one to observe in practice....").

Plaintiff submits the Affidavit of Christopher P.N. Woodcock, an Associate with Camp, Dresser and McKee, Inc., of Boston's Management and Financial Services Group. The affiant is proffered as an expert in utility rates. He states:

4. The utility basis of determining revenue requirements is generally mandated for all investor-owned water utilities and for most publicly owned (municipal) systems under the jurisdiction of state commissions or other regulatory bodies. It is also the appropriate method for determining the cost of service applicable to customers served outside of the corporate limits by a publicly owned water utility. When a public owned utility provides service to customers outside the corporate limits, the situation is similar to the relationship of an investor-owned utility to its customers since the owner (municipality) provides service to non-owner customers (customers outside corporate limits). In this situation, the public owned utility, like an investor-owned utility, is entitled to a reasonable return from non-owner customers based on the value of its plant required to serve those customers. The use of the utility basis can reduce controversy since it generally results in more stable rates because they are not so immediately affected by the level of system capital expenditures as are rates under the cash basis.

5. The utility basis for determining a water utility's revenue requirements includes two components in addition to the daily costs for items such as labor, energy, chemicals, and maintenance: (1) depreciation expense, and (2) return on investment.

. . . .

9. LABOR is not a resident user. LABOR does not pay any Town taxes and does not contribute to the welfare of the Town. The Town is entitled to recover as an operating cost of producing water its capital investment over the anticipated useful life of the depreciable assets, and a reasonable return on its equity capital.

Affidavit of Christopher P.N. Woodcock, Apr. 21, 1989, ¶¶ 4, 5, 9.

The terms "operation costs" and "Reserve" are ambiguous if each is susceptible to two different interpretations, and each interpretation was consistent with the contract language. *Sun Shipbuilding & Dry Dock Co. v. United States*, 183 Ct.Cl. 358, 372, 393 F.2d 807, 815–16 (1968). Regarding depreciation, plaintiff argues that the Reserve amount, included in the estimate of operation costs submitted by plaintiff, was intended to signify depreciation. Further, plaintiff contends that even if Labor did not understand Reserve to be depreciation, Labor agreed to pay for depreciation when it suggested on October 4, 1985, that it pay an interim rate of $1.57 per 1,000 gallons of water. According to plaintiff, this agreement shows Labor's intent to pay for depreciation, since Labor, when making the suggestion, knew that plaintiff's earlier request to be paid $1.57 per 1,000 gallons of water had included an amount for Reserve. Additionally, to establish Labor's intent to pay for depreciation, plaintiff relies upon an internal Labor memorandum dated November 4, 1985, that states: "We understand you are satisfied with the documentation justifying a $1.57 rate...." Defendant counters plaintiff's arguments by pointing out that there was no agreement as to the meaning of "Reserve" and, further, that the cost estimate that included Reserve was not incorporated into the contract.

■ While the cost estimate was not incorporated expressly into the contract, it might demonstrate the intentions of the parties at the time of contract formation. The 1981 estimate lists Reserve as a cost, but nothing in the cost estimate indicates that Reserve is depreciation. The only indication that Reserve is intended to be depreciation is plaintiff's documentation of costs over three years after the contract was signed. "[I]t is a fundamental principle of contract interpretation that one party's unexpressed, subjective intentions do not bind the other party." *Southern Pac. Transp. Co. v. United States*, 219 Ct.Cl. 540, 548, 596 F.2d 461, 466 (1979) (citing *ITT Arctic Serv. Inc. v. United States*, 207 Ct.Cl. 743, 752, 524 F.2d 680, 684 (1975)). Plaintiff may have intended for Reserve to be depreciation, but no reason emerges from the record to support the implication that Labor intended such, and Labor thus is not bound by the intentions of plaintiff. Therefore, the cost estimate alone does not demonstrate that it was the parties' implied intention that "operation costs" in the contract include depreciation.

Furthermore, Labor's offer to pay an interim rate of $1.57 per 1,000 gallons of water does not evidence the intent of the parties to include depreciation cost in the contract. After plaintiff documented costs to be $1.99 per 1,000 gallons of water, Labor suggested to plaintiff that it pay an interim rate of $1.57 per 1,000 gallons of water until certain issues, including the Reserve amount, were resolved. This indicates that Labor was not accepting Reserve, documented by plaintiff to be depreciation, as a part of "operation costs"—not, as plaintiff contends, that Labor was agreeing to pay depreciation. The subsequent internal Labor memorandum stating, in part, "We understand that you are satisfied with the documentation justifying a $1.57 rate...." does not show that Labor intended to include depreciation in the contract, since Labor already had expressed to plaintiff that Reserve was a problem area in plaintiff's documentation of costs.

Disputed issues of fact preclude summary judgment on this issue. Since this claim will be tried, defendant may pursue its countercharge that plaintiff overcharged Labor.

With regard to a fair rate of return on equity capital, neither Labor or plaintiff exhibited an intent to include it as a part of "operation costs." When documenting

costs in 1985, plaintiff did not include a fair rate of return on equity capital. Plaintiff acted inconsistently with a professed intent to include a fair rate of return on equity capital in the contract because plaintiff omitted this item. Only in a subsequent letter did plaintiff argue it was justifiable to make the adjustment. Rather than demonstrating intent to include a fair rate of return on equity in the contract, the evidence is more consistent with a finding that plaintiff considered charging such a cost to Labor only after the contract was signed. Defendant is entitled to summary judgment on this claim.

## CONCLUSION

Based on the foregoing, defendant's cross-motion for summary judgment is granted as to plaintiff's claim for a rate reflecting a fair rate of return on equity and otherwise is denied. Plaintiff's motion for summary judgment is denied. A scheduling order has been entered separately.

IT IS SO ORDERED.