The MORELAND CORPORATION, Appellant,

v.

Anthony J. PRINCIPI, Secretary of Veterans Affairs, Appellee.

No. 00–1523.

United States Court of Appeals, Federal Circuit.

Aug. 7, 2001.

George F. Vogt, Jr., Herrig & Vogt, LLP, of Rancho Cordova, CA, argued for appellant. Of counsel was Hazel M. Bergtholdt.

Gary Dernelle, Trial Attorney, argued for appellee. With him on the brief were David M. Cohen, Director; and Kathryn A. Bleecker, Assistant Director. Of counsel were Carrie Sutherland, Attorney, and Millicent M. Gompertz, Attorney, Washington, DC.

Before MICHEL, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and CLEVENGER, Circuit Judge.

FRIEDMAN, Senior Circuit Judge.

This appeal challenges a decision of the Department of Veterans Affairs Board of Contract Appeals (Board) denying a contractor's claim for additional rental for the space it leased to the government that exceeded the maximum space for which the lease provided the government would pay. We affirm.

I

The basic facts are undisputed. In December 1994, the Department of Veterans Affairs solicited offers to provide leased space for an ambulatory care center. Section 1.1 of the Solicitation stated that the government was "interested in leasing 148,260 net usable square feet" (square feet) and that "[o]ffer[ ]s must be within the square footage range ... and comply with Schedule D, Architectural Layout Drawings, showing circulation and adjacencies." The Solicitation further specified that the "space ... should be on no more than three contiguous floors" and "may be provided by new construction or modification of existing space." The lease was to be for fifteen years with a five year renewal option. Section 10.1 of the Solicitation stated that "[o]ral instructions are not binding."

After a pre-bid conference, Section 1.1 of the Solicitation was amended to provide a range from "a minimum of 148,000 to a maximum of 148,260 net usable square feet." Solicitation No. 084B–001–94, Amendment No. 2. The amendment stated that

VA will not pay for more space in excess of the maximum amount solicited.

The Solicitation also provided in paragraph 3.14, captioned "Changes," that "the Contracting Officer may make changes within the scope of the lease by a written order pursuant to the Changes clause set forth in paragraph 17 of GSA Form 3517" and indicated that a copy of that form was attached to the solicitation. Similarly, the lease incorporated by reference GSA Form 3517, and included General Clause 33.552.270–21—"Changes" which stated:

(a) The Contracting Officer may at any time, by written order, make changes within the general scope of this lease in any one or more of the following:

(1) Specifications (including drawings and designs);

(2) Work or services; or

(3) Facilities or space layout. . . .

(d) Absent such written change order, the Government shall not be liable to Lessor under this clause.

The appellant The Moreland Corporation (Moreland) submitted a proposal to provide a newly constructed, two-story office building with 148,260 net usable square feet. The government entered into a lease with Moreland covering such building "containing approximately 148,260 net usable square feet of space . . . to be constructed in accordance with specifications set forth in [the] Solicitation . . . and addenda thereto." The lease was for fifteen years at an annual rental of $2,139,391.80. The lease provided that

*payment will not be made for delivered space which is in excess of 148,260 [net usable square feet]* (emphasis in original).

The design and layout of the building, which were required to meet the specifications of the Solicitation and its schedules, were left to Moreland, which was required to and did submit three successive sets of working design drawings for Departmental approval. As the construction proceeded, various changes were made in the design and structure. The contracting officer issued a large number of written change orders, for which the government paid Moreland.

The completed building contains 165,110 net usable square feet. When the government refused to pay rent for the space that exceeds 148,260 square feet, Moreland asked the contracting officer that "the lease be amended to include the additional 16,698 square feet for the initial term and option period of the lease." After the contracting officer denied that request, Moreland appealed to the Board which, in a lengthy opinion, granted the government's motion for summary judgment and denied Moreland's claim for a $4,650,814 increase in rental payments for the additional space. *Moreland Corp.*, VABCA No. 5409 & 5410, 00–1 BCA ¶ 30,640 (Nov. 3, 1999) (Board decision).

The Board held that the lease provision stating that "payment will not be made for delivered space which is in excess" of the maximum amount solicited was "express and unambiguous." Board decision, slip op. at 44. The Board noted that during Moreland's construction of the building, the government issued "206 bilateral supplemental lease agreements in which [the government] paid Moreland an additional $1.6 million for change orders and granted time extensions totaling 71 days. These agreements involved various architectural, electrical and material changes (fixtures and equipment). None of these change

orders involved adding space to the building." Board decision, slip op. at 36.

The Board rejected Moreland's "contention that it was impossible to maintain the layout and adjacencies of Schedule D and the room sizes of Schedule C with the 148,260 [net usable square feet] maximum set by the Government." Board decision, slip op. at 47 (internal quotation marks omitted). The Board pointed out that Moreland raised this claim of impossibility not during the design phase, prior to construction of the building, but in its appeal. Board decision, slip op. at 47. The Board noted that "[a]s designer of the building, Moreland was in the best position to know whether it was impossible to comply with the Lease requirements. Notification during the design process prior to construction would have allowed [the government] to consider its options, including recission, modification of its requirements, or amendment of the Lease to acquire more space." Board decision, slip op. at 50.

## II

■ A. The lease unambiguously and explicitly stated that the government would not pay for more than 148,260 net usable square feet. In its initial solicitation the government stated that it was "interested in leasing 148,260 net usable square feet." The amendment to the Solicitation pointed out that the government "will not pay for more space in excess of the maximum amount solicited." The lease stated:

> *payment will not be made for delivered space which is in excess of 148,260 [net usable square feet]* (emphasis in original).

By underlining the words, the lease emphasized and called attention to their critical importance.

The foregoing limitation on payment under the lease was part of paragraph 12, which stated:

Annual rental payments under this lease shall be computed by multiplying the net usable square feet (nusf) contained in the leased premises, as mutually measured by the Government and the Lessor by $14.43, the per nusf cost contained in the Lessor's offer. In the event that the nusf provided by the Lessor and accepted by the Government is other than 148,260 nusf, such nusf figure shall be multiplied by $14.43 to arrive at the annual rental rate; *however, payment will not be made for delivered space which is in excess of 148,260 nusf.* Should the rental then vary from that stated in Article 3 of the lease, the revised rental rate will be established by amendment to this lease.

Moreland contends that this provision of the lease "specifically states that MORELAND is to be compensated for all net usable square footage provided." The language upon which Moreland relies—if the square footage "is other than 148,260," then that other amount "shall be multiplied by $14.43 to arrive at the annual rental rate"—is immediately followed, as part of the same sentence, by "however" and then the 148,260 foot payment limitation.

The "however" clause modifies and qualifies what immediately precedes it. What the entire sentence unambiguously states is that if the number of square feet is other than 148,260, the government will pay only for the actual footage it receives but in any event not in excess of 148,260. For example, if Moreland were to provide 147,900 square feet, the government would pay only for the latter number and not for 148,260. The last sentence quoted above, providing for amendment of the lease to reflect "the revised rental rate," covers that situation. This entire provision is unambiguous and cannot properly be read as obligating the government to pay for more than 148,260 square feet.

B. Under the lease only the contracting officer could change the lease's provisions and any such changes would have to be written.

■ Section 10.1 of the Solicitation specified that "[o]ral instructions are not binding." The lease stated that "the Contracting Officer may make changes within the scope of the lease by a written order pursuant to the Changes clause." The Changes clause provided that "[t]he Contracting Officer may at any time, by written order, make changes ... in ... (1) Specifications (including drawings and designs); (2) Work or services; or (3) Facilities or space layout.... Absent such written change order, the Government shall not be liable to Lessor under this clause." Moreland does not, and cannot, cite any written change order of the contracting officer that increased the amount of leased space under the contract, even though he issued more than 200 bilateral change orders to the lease.

■ Moreland contends, however, that the contracting officer's approval of Moreland's third set of design drawings constituted an agreement to pay for the additional space provided. The argument apparently is that because construction of the building in accordance with those drawings would provide more than 148,-260 square feet, the contracting officer necessarily approved and agreed to pay for the excess when he approved the drawings.

Such a vague and conjectural analysis is insufficient to modify the unequivocal contractual provision that "payment will not be made for delivered space which is in excess of 148,260" square feet. Indeed, the contracting officer's letter approving the drawings itself undermines Moreland's contention. The letter stated that the Department had "made every effort to insure that your 100% working drawings comply with the requirements of the lease con-tract. However, you are still responsible for all errors and omissions."

This court rejected a similar attempt to avoid a contractual limitation on the amount the government would pay on the basis of alleged oral statements that it would pay more in *City of Oxnard v.. United States*, 851 F.2d 344 (Fed.Cir. 1988). That case involved contracts between Oxnard and the Department of the Navy under which the city agreed to connect naval installations to its sewage and water treatment facilities, and the Navy to pay portions of the construction cost of the projects, which were "not to exceed" stated amounts. *Id.* at 345–46. The total construction costs, however, exceeded the estimated amount.

When the Navy refused to pay more than the "not to exceed" amount specified in the contract, Oxnard challenged the government's refusal in this court. It contended that "persons representing the Navy told them that 'not to exceed' clauses were always included in Navy contracts, but that the Navy would pay its fair share and when the project was finished the Navy would request any necessary additional funds." *Id.* at 346.

This court upheld the Navy's refusal to pay the additional amounts. It explained:

While the Navy does not dispute that the Connection Charges set in the contracts were calculated as a percentage of the total estimated costs, the final contracts do not obligate the Navy to pay a percentage of the total costs. Instead, the contracts state a specific dollar amount, and a specific 10% contingency, totaling a not-to-exceed dollar amount. The Navy emphasizes that this contingency of 10% above the estimated costs shows the contractual intent and mutual understanding that the Navy had limited its obligation to contribute to cost overruns. We conclude, as did the Board, that this plain reading of the contract is

more reasonable than Oxnard's position that the not-to-exceed prices were only "funding control devices".

The contracts are not inherently ambiguous, and are not reasonably susceptible of an interpretation that is at odds with their text.

*Id.* at 347–48.

This court's reasoning in *Oxnard* is equally applicable to the present case. Here, as there, the "plain reading of the contract" shows that the parties limited the government's monetary obligation (here to pay rent) to a specified amount (here rent on 148,260 square feet), and that these unambiguous contractual limitations could not be avoided by the government's alleged verbal statements that it would pay more.

 C. Moreland also invokes the doctrine of impossibility of performance. It argues that the Department's space and configuration requirements set forth in the solicitation and its schedules could not be met by a structure that contained only 148,260 square feet. The doctrine might excuse Moreland's failure to comply with any obligation it may have had under the contract not to exceed the 148,260 square feet limitation. *See United States v. Winstar Corp.,* 518 U.S. 839, 904, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (noting that the "doctrine of impossibility imposes . . . requirements before a party may avoid liability for breach."); *Restatement (Second) of Contracts* § 266(1) ("Where, at the time the contract is made, a party's performance under it is impractical without his fault . . . no duty to render performance arises."). It is difficult to see, however, how the doctrine could require the government to pay for more space than the maximum amount for which the contract stated it would pay.

 In any event, the argument is unpersuasive. Since Moreland designed the building and its layout, it was in the best

position to know whether its proposal satisfied the contract's space limitations, or whether it was impossible to do so based upon the stated requirements. As the Board noted in properly rejecting this contention, Moreland did not raise the impossibility claim until the appeal, long after the construction had been completed. As it stated, "[i]f it were impossible to meet the Government's requirements within 148,260 nusf, this impossibility would have been discovered during the design phase rather than after the building was constructed." Board decision, slip op. at 49. The Board pointed out: "Notification during the design process prior to construction would have allowed [the Department] to consider its options, including recission, modification of its requirements, or amendment of the Lease to acquire more space." Board decision, slip op. at 50.

Moreland cannot justify its failure timely to raise the impossibility claim on the ground that, because the Department had approved the final design plans, Moreland justifiably assumed that a structure constructed in accordance with those plans would contain no more than 148,260 square feet. It was Moreland's responsibility to provide leasable space in accordance with the contract.

As we view the case, therefore, any disputed issues of fact, which Moreland contends precluded summary judgment by the Board, were not "material" issues because their resolution was unnecessary to decide the case. Summary judgment for the government accordingly was proper.

## CONCLUSION

The decision of the Department of Veterans Affairs Board of Contract Appeals is *AFFIRMED.*