**GRESHAM, SMITH & PARTNERS, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**SWIFT ROOFING, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

Nos. 91–60C, 91–109C.

United States Claims Court.

Dec. 23, 1991.

Stephen M. Phillips, Atlanta, Ga., for plaintiff Swift Roofing, Inc. Hendrick, Spanos & Phillips, of counsel.

Barbara J. Moss, Nashville, Tenn., for plaintiff Gresham, Smith & Partners. Arthur T. Kornblut and Gary K. Stearman, of counsel.

B.J. Meadows, Washington, D.C., for defendant. Garry Jacques, U.S. Postal Service, of counsel.

## OPINION

NETTESHEIM, Judge.

This case is before the court after argument on defendant's motion for partial summary judgment against a subcontractor, suing on behalf of the prime. The issue for decision is whether the prime contractor released the subcontractor's

claim and whether the doctrine of patent ambiguity bars both contractors' claims.

## FACTS

The following facts are undisputed, unless otherwise noted. On June 14, 1985 the United States Postal Service (the "Postal Service") and Rentenbach Constructors, Inc. ("Rentenbach"), entered into Contract, No. 109320–85–V–0049 (the "prime contract") for the construction of the General Mail Facility (the "GMF") in Nashville, Tennessee. On September 25, 1985, Rentenbach and Swift Roofing, Inc. ("Swift")[1] entered into a subcontract, whereby Swift contracted to install the roof at the GMF in accordance with the prime contract.

The specifications pertaining to the roof require the installation of two layers of insulation. The first layer is a 3⅛–inch thick iscoyanurate foam board mechanically attached to the roof deck, followed by a second layer of 1–inch thick perlite roof board set in hot asphalt. Above the two layers of insulation, a roof membrane consisting of four plies of glass fiber felts all laid in moppings of coal tar was to be installed. The specifications then called for a "double aggregate surface course" such that a flood coat of 50 pounds per square of bitumen would first be applied, to which 200 pounds of gravel aggregate would be cast; this first aggregate surface course would be followed by a second flood coating of 75 pounds of bitumen and 300 pounds of gravel aggregate.

The language of Part Three "Execution" of section 07510 of the prime contract, "Built-up Bituminous Roofing (Coal Tar)," requires the contractor to "[c]oordinate the installation of roofing materials and associated work so as to provide a complete system complying with the recommendations of the manufacturers." Part Three "General Installation Limitations" of section 07510 further states that the plies of roofing membrane (felt and hot coal tar pitch) must be installed in the fashion specified in the contract, unless deviation is required "in order to comply with the recommendation of the roofing materials man-

ufacturer." Under a separate heading, "Double Aggregate Surface Course," Part Three of the specification also requires the installation of two separate courses of "gravel aggregate," or rock ("double rocking"). The specific material manufacturer is not designated in the prime contract, although several are listed.

Manville Roofing Systems, Inc. ("Manville"), the materials manufacturer for the GMF project, recommended to Swift that a single course of gravel aggregate was necessary for the GMF roof. Manville did not recommend or include a specification for a double rocking procedure in its manual for 1985. This was true, as well, for all the other manufacturers listed in the specification. Manville recommended to Swift that only a single course of gravel aggregate was necessary for the roof and recommended a smaller amount of aggregate. Manville issued a guarantee on the roof. Swift provided a copy of the Manville manual to the Postal Service's architect and agent, plaintiff Gresham, Smith & Partners ("Gresham, Smith") sometime prior to August 1985. Gresham, Smith reviewed and approved Manville's manual specifications for roof installation; the stamp indicating this approval is dated August 20, 1985.

In addition to articulating the design and construction of the roof, Part One of section 07510 also provides for a "Preapplication Conference" "for the purpose of reviewing materials selections and procedures to be followed in performing the work in compliance with the requirements specified." The provision specifies that the conference is to be attended by the contracting officer, the contractor, the roofing sub-contractor, the primary roofing materials manufacturer, and the inspection and testing representative. At the preapplication conference for the roofing contract on November 18, 1985, Rentenbach and Swift communicated to the Postal Service that Manville's recommendations for the amount of gravel aggregate required on the roof varied with the specifications in the contract. This conversation is reflected

---

1. Swift sued in the Claims Court through Rentenbach.

in the minutes of the preapplication conference. At this conference Rentenbach and Swift were directed to install rocking on the roof at the GMF "per Specs." Swift requested that this claimed variance with the contract be in writing.

At some point the contracting officer directed Swift to provide additional rock. After the roof was installed, it began to split apart in several places. Rentenbach held a general meeting to discuss the problem at the GMF on January 21, 1987. The minutes of the meeting reflect that Swift maintained that the source of the roofing splits was the double rocking. Both Rentenbach and Swift questioned the architect about the necessity for double rocking. The architect would permit no deviation from the design set forth in the contract. It was agreed that Swift would repair the existing splits to the roof.

On July 18, 1988, Rentenbach's Assistant Vice President, Sam Smith, executed PS form 7307, Contractor's Release ("release"). The release states, as follows:

Pursuant to the terms of subject contract and in consideration of the sum of $12,824,539.00 (twelve million, 824 thousand 539 dollars and no cents [ ) ] which has been or is to be paid under said contract to Rentenbach Constructors, Inc. (hereinafter called the Contractor) or its assignees, if any, the Contractor, upon payment of said sum by the UNITED STATES POSTAL SERVICE, (hereinafter called the Postal Service), does remise, release and discharge the Postal Service, its officers, agents and employees, of and from all liabilities, obligations, claims, and demands whatsoever under or arising from said contract except:

1. Specified claims in stated amounts, or in estimated amounts where the amounts are not susceptible of exact statement by the Contractor, as follows:

Any and all claims related to roofing repairs.[2]

Rentenbach and Swift communicated to the Postal Service prior to the execution of the general release that they believed the double rocking was a cause of the roof splits that Swift was required to repair. According to Thomas C. Walton, Rentenbach's Senior Vice President, at the time Rentenbach executed the general release, all parties, including the Postal Service, were fully aware of the problems with the roofing system and claims relating to the roof. Affidavit of Thomas C. Walton, Oct. 24, 1991, ¶ 3. Mr. Walton also avers that, after executing the general release in July 1988, Rentenbach, Swift, and the Postal Service held several meetings during which the parties' claims regarding the roof were discussed, including Swift's double rocking claim, and that the Postal Service considered it on the merits. *Id.* ¶ 6.

Also on July 18, 1988, the Postal Service executed PS Form 4211–B, Invoice and Payment Authorization, authorizing final payment to Rentenbach for completion of construction under the prime contract. The amount of this payment was $1,000.00. This payment authorization was not executed by the contracting officer until April 11, 1989. On April 13, 1989, the Postal Service's contracting officer wrote to Rentenbach enclosing a copy of this final payment authorization. The contracting officer noted in his letter that although final payment was being issued to close out the contract for administrative purposes, the final payment would not waive the Postal Service's rights to any future claims "due to the roof problems." The letter also indicated that payment would be received from the Postal Service approximately two weeks later. Rentenbach never deposited or cashed the Postal Service's final payment of $1,000.00.

On September 8, 1989, Rentenbach submitted a "Claim for Additional Compensation" to the Postal Service. The claim broke down costs incurred by both Rentenbach and Swift in repairing the roof. The additional costs claimed by Rentenbach totalled $48,758.89. Swift claimed that its

---

**2.** This last line was typed into the contract and, like the name of the contractor and the contract amount, is not part of the form Contractor's Release.

additional costs were in the amount of $150,688.33. Rentenbach's breakdown of costs were, as follows:

| | | |
|---|---|---|
| I. | Payment made on Swift's Invoice Nos. 2251 and 2334 for Roof Split Repairs (Invoices attached) | $ 7,686.50 |
| II. | Consulting Services and Attorneys' Fees | 13,933.82 |
| III. | Extra Travel and Related Costs (See attached breakdown) | 9,007.01 |
| | | $ 30,627.33 |
| | Rentenbach's 10% Commission: | 3,062.73 |
| | | $ 33,690.06 |
| IV. | Rentenbach's 10% Commission on Swift's Unreimbursed Extra Costs and Expenses | 15,068.83 |
| | GRAND TOTAL OWED REN-TENBACH | $ 48,758.89 |

(Emphasis added.) The breakdown of Swift's costs included the following:

| | | |
|---|---|---|
| I. | Costs incurred in repairing roof splits (equipment, travel, labor and materials as per attached) | $ 39,291.48 |
| II. | Extra management costs incurred in addressing roof splitting problem (as per attached) | $ 3,114.76 |
| III. | Costs incurred in complying with directive to add rock over specified amount (as per attached) | $ 23,079.80 |
| IV. | Costs incurred in complying with defective specification requiring double rocking | $ 60,087.57 |
| | SUBTOTAL I–IV | $125,573.61 |
| | SWIFT'S 20% OVERHEAD AND PROFIT | $ 25,114.72 |
| | GRAND TOTAL OWED SWIFT | $150,668.33 |

(Emphasis added.) After Rentenbach executed the general release, the Postal Service considered Swift's double rocking claim on the merits. In his final decision dated January 26, 1990, the contracting officer recognized that the splits were caused by factors not attributable to Rentenbach or Swift. The contracting officer, nevertheless, denied the claims.

Swift filed suit, in the name of Rentenbach, on January 25, 1991, asking for an award to Swift and Rentenbach of $190,-004.48. The case was consolidated with a separate action brought by Gresham, Smith against the Government. Defendant's motion is addressed solely to Swift's complaint.

## DISCUSSION

Defendant contends that Rentenbach/Swift's claims are barred by the release executed by Rentenbach. Defendant also argues that the doctrine of patent ambiguity required Rentenbach, in order to avoid forfeiting its claim, to alert the Postal Service prior to contract award that no manufacturer could supply double aggregate roofing.

### 1. *Summary judgment standards*

 Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. RUSCC 56(c). Only disputes over material facts, or facts that might significantly affect the outcome of the suit under the governing law, preclude an entry of judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine if the evidence would permit a reasonable jury to return a verdict in favor of the non-movant. *Id.* Defendant, as the moving party, has the burden of establishing that there are no genuine material issues in dispute and that the defendant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In opposing defendant's motion, Swift has the burden of providing sufficient evidence, not necessarily admissible at trial, to show that a genuine issue of material fact indeed exists. *Celotex*, 477 U.S. at 322, 324, 106 S.Ct. at 2553.

> To create a genuine issue of fact, the non-movant must do more than present *some* evidence on an issue it asserts is disputed. The Court stated:

>> [T]here is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence [of the non-movant] is merely colorable, or is not significantly probative, summary judgment may be granted.

*Avia Group Int'l, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1560 (Fed.Cir. 1988) (emphasis in original) (quoting *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (citations omitted), and citing *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53, and *Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)).

### 2. *Release*

█ The release is a contractual provision, and its interpretation is a matter of law. *Alliance Oil & Refining Co. v. United States*, 13 Cl.Ct. 496, 502 (citing *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed.Cir.1984)), *aff'd*, 856 F.2d 201 (Fed.Cir.1988). Exceptions to releases of claims are strictly construed against government contractors. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1394 (Fed.Cir.1987).

As a general rule, the execution by a contractor of a release which is complete on its face reflects the contractor's unqualified acceptance and agreement with its terms and is binding on both parties. It is further well established that where a contractor has the right to reserve claims from the operation of release, but fails to exercise that right ... it is neither improper nor unfair, absent some vitiating or aggravated circumstance, to preclude the contractor from maintaining a suit based on events which occurred prior to the execution of the release.

*Clark Mechanical Contractors, Inc. v. United States*, 5 Cl.Ct. 84, 86 (1984) (citations and footnote omitted). However, in reading contract provisions, the court's purpose is to " 'give full force and effect to the expressed or implied intentions of the contracting parties, if such can be discerned.' " *Truong Xuan Truc v. United States*, 212 Ct.Cl. 51, 66, 1976 WL 905 (1976) (quoting *Massachusetts Port Auth. v. United States*, 456 F.2d 782, 784, 197 Ct.Cl. 721, 726 (1972)); *see also SCM Corp. v. United States*, 675 F.2d 280, 283, 230 Ct.Cl. 199, 203 (1982); *Honeywell Inc. v. United States*, 661 F.2d 182, 186, 228 Ct.Cl. 591, 596 (1981); *Dynamics Corp. of America v. United States*, 389 F.2d 424, 429, 182 Ct.Cl. 62, 72 (1968). An interpretation that accords with the views of the parties expressed during performance is a relevant consideration in interpreting a contract. *General Warehouse Two, Inc. v. United States*, 389 F.2d 1016, 1020, 181 Ct.Cl. 180,

187 (1967) (cited in *Sperry Corp. v. United States*, 845 F.2d 965, 970 (Fed.Cir.1988)).

█ The issue is whether Rentenbach's execution of the release reserving all claims on the project except those related to roofing repairs bars Rentenbach's and Swift's claims for complying with the directive to provide double aggregate (Swift's claim for $60,087.57 and part of Rentenbach's claim of $15,068.83 representing 10 percent commission on Swift's unreimbursed extra costs and expenses.) More precisely, the issue is whether the exception preserved the contractors' claims for providing double aggregate, not whether circumstances existed that would allow these claims to be considered despite the execution of a release covering the claim. *See Mingus Constructors*, 812 F.2d at 1395.

Rentenbach's claim included Swift's. Swift's claim distinguished between costs incurred "in repairing roof splits," on the one hand, and costs "in complying with the directive to add rock over specified amounts" and costs "incurred in complying with defective specifications requiring double rocking," on the other. Rentenbach made no distinction.

Defendant argues that Rentenbach and Swift are bound by Rentenbach's execution of the release excepting "[a]ny and all claims related to roofing repairs," which defendant construes as delimiting the claim only to repairing the splits, a distinction that Swift acknowledged, according to defendant. Swift rejoins that the exception is not limited to roofing repairs, but, rather, includes any and all claims relating to roofing repairs. Swift argues that this language is broader than a claim for repairs of the splits alone. The court agrees with this construction.

Swift argues that the Postal Service itself viewed Rentenbach's and Swift's claims as encompassing both the repair of the splits, as well as the condition that was thought to cause the splits—the requirement to provide double aggregate. For example, on April 13, 1989, the contracting officer wrote Rentenbach that the Postal Service, by making final payment, did not

waive its right to any claims in the future "due to the roof problems." Although defendant correctly points out that the Postal Service was referring to its own claims, the point to be made is that the parties used the term generically. On October 27, 1989, the contracting officer wrote Rentenbach acknowledging receipt of Rentenbach's certified claim "in connection with roof repair costs." Rentenbach's claim, which included Swift's, listed claims for repairing roof splits, as well as for double rocking. The contracting officer referred to these claims as "in connection with roof repair costs," which signifies a mutual understanding between the contracting personnel and Rentenbach that Rentenbach's exception of "any and all claims relating to roofing repairs" did not confine Rentenbach/Swift's claims to costs for repairing roof splits alone. Swift's arguments persuade that the shared construction of Rentenbach/Swift and the contracting officer was that all claims relating to roofing repairs encompassed Rentenbach/Swift's claims relating to the problem that generated the repairs.

### 3. Patent ambiguity

▮▮▮▮ The court's first duty in construing disputed contractual provisions is to " 'ascertain analytically whether *vel non* an ambiguity existed' " in the specifications. *John C. Grimberg Co., Inc. v. United States*, 7 Cl.Ct. 452, 456 (1985) (quoting *Enrico Roman, Inc. v. United States*, 2 Cl.Ct. 104, 106 (1983)), *aff'd mem.* 785 F.2d 325 (Fed.Cir.1985) (unpubl.). Matters of pure contract interpretation—including specifications—fall within the court's purview for resolution. *See P.J. Maffei Bldg. Wrecking Corp.*, 732 F.2d at 916. An interpretation giving rise to reasonable meaning to all parts of a contract will be endorsed over one that leaves portions of the contract meaningless. *Fortec Constructors v. United States*, 760 F.2d 1288, 1292 (Fed.Cir.1985) (citing *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed.Cir.1983)). Established court precedent and rules of construction require that contract provisions should not be interpreted as conflicting with one another unless there is no other reasonable construction of the language possible. *Hol–Gar Mfg. Corp. v. United States*, 351 F.2d 972, 979, 169 Ct.Cl. 384, 395 (1965). However, a contract is ambiguous if it is susceptible of two different interpretations, each of which is found to be consistent with the contract's language. *Sun Shipbuilding & Dry Dock Co. v. United States*, 393 F.2d 807, 815–16, 183 Ct.Cl. 358, 372 (1968).

▮▮▮▮ Once an ambiguity is found to exist, the issue becomes whether the disputed provisions were patently ambiguous at the time of contracting. If they were, a duty then arises on the part of the non-drafting party to inquire as to their meaning. *Fort Vancouver Plywood Co. v. United States*, 860 F.2d 409, 414 (Fed.Cir. 1988). Thus, if differing constructions of the contract's plain meaning are plausible, the court must inquire whether such discrepancies would be apparent to a reasonably prudent contractor. *John G. Grimberg Co.*, 7 Cl.Ct. at 456. Contractors must inquire only as to major discrepancies, obvious omissions, or manifest conflicts in contract provisions. *WPC Enter., Inc. v. United States*, 323 F.2d 874, 877, 163 Ct.Cl. 1, 6 (1963). As the Court of Claims stated in *Wickham Contracting Co., Inc. v. United States*, 546 F.2d 395, 398, 212 Ct.Cl. 318, 323–24 (1976):

> Under circumstances where a patent and glaring discrepancy exists in a contract drawing, and such a discrepancy would be recognized by a reasonable bidder, there is a burden imposed on such a bidder to seek clarification ... before submitting a bid, if the bidder, subsequent to an award to it, hopes to rely on its unilateral resolution of the discrepancy issue as a basis for a subsequent contract price adjustment claim. *Merando, Inc. v. United States*, 475 F.2d 601, 201 Ct.Cl. 23 (1973); *Space Corp. v. United States*, 470 F.2d 536, 539, 200 Ct.Cl. 1, 5–6 (1972); *Beacon Constr. Co. v. United States*, 314 F.2d 501, 504, 161 Ct.Cl. 1, 7 (1963)....

The standard for determining a patent ambiguity is calibrated, but not precisely. To be denominated a patent ambiguity, the

ambiguity must unequivocally be " '*so glaring* as to raise a duty to inquire.' " *Fort Vancouver Plywood Co.*, 860 F.2d at 414 (quoting *United States v. Turner Constr. Co.*, 819 F.2d 283, 286 (Fed.Cir.1987) (emphasis in original)). When resolving whether a contract is patently ambiguous, "the language must be placed at a point along a spectrum of ambiguity...." *Fort Vancouver Plywood Co.*, 860 F.2d at 414 (citation omitted).

It is not the contractor's actual knowledge, but the obviousness of the inconsistency that imposes the duty to inquire. *Chris Berg, Inc. v. United States*, 455 F.2d 1037, 1045, 197 Ct.Cl. 503, 515 (1972). "This proposition is for application in situations where a bidder knew, as well as in situations where a bidder should have known, of the discrepancy...." *Wickham*, 546 F.2d at 398, 212 Ct.Cl. at 324. A contractor's failure to comprehend an obvious ambiguity in no way excuses its affirmative duty of inquiry. *Carothers Constr. Co., Inc. v. United States*, 20 Cl.Ct. 556, 560 (1990) (citing *J.A. Jones Constr. Co. v. United States*, 395 F.2d 783, 184 Ct.Cl. 1 (1968)).

Significant policy considerations undergird the policy of imposing a duty of inquiry on a contractor when the discrepancy is sufficiently obvious. In particular, it encourages clarification of ambiguities or correction of errors before the contract award and thereby avoids the need for expensive and complex litigation during contract administration. *Monarch Painting Corp. v. United States*, 16 Cl.Ct. 280, 287 (1989) (citing *Beacon Constr. Co. v. United States*, 314 F.2d 501, 504, 161 Ct.Cl. 1, 6–7 (1963)).

> The pre-award clarification requirement bolsters the competitive bidding system. The duty to inquire prevents one contractor from exploiting ambiguity in the contract so as to bid only on a portion of the work solicited and thereby appear to be the low bidder. Requiring disclosure of ambiguous provisions or constructions of the contract before bidding ensures that all contractors bid on the basis of identical specifications.

*Monarch Painting*, 16 Cl.Ct. at 287. In short, the contractor ordinarily bears the burden of inquiry in order that all parties may avoid complex and costly litigation. The principle of patent ambiguity deters a "bidder, who knows (or should know) of a serious problem in interpretation, from consciously taking the award with a lower bid ... with the expectation that he will then be able to cry 'change' or 'extra' if the procuring officials...." disagree with the contractor's interpretation. *S.O.G. of Arkansas v. United States*, 546 F.2d 367, 371, 212 Ct.Cl. 125, 131 (1976).

In this case Rentenbach/Swift confronted a patent ambiguity. The specifications unequivocally called for double aggregate and listed acceptable manufacturers. The requirement was underscored. The specifications directed the contractor to coordinate with the listed roofing manufacturer's recommendations. Swift admits that it did so. Swift's Br. filed Oct. 31, 1991, at 15. Rentenbach/Swift bid on the basis of a single layer of aggregate because Manville both recommended and warranted it. *See id.* Swift arrogated to itself the decision to provide a different surface than the Postal Service specified. The doctrine of patent ambiguity was developed to penalize this precise course of action. Nothing in the contract documents afforded Swift the option to ignore or vary an express contract requirement. The specifications told the contractor to coordinate with a listed roofing materials manufacturer's recommendations, not to override the specifications consistent with a manufacturer's recommendations. The specifications explicitly authorized such an override in respect of laying multiple-ply courses of felt and hot coal tar pitch, but this provision did not apply to the double aggregate surface course. Swift says that it obtained the architect's (Smith Gresham's) approval and that it discussed its plan to lay a single course at the pre-application conference. Both of these events occurred after Rentenbach was awarded the contract. Swift cannot countervail the consequences of the patent ambiguity that it confronted and the choice it made. *See Troise v. United States*, 21 Cl.Ct. 48 (1990) (patent ambi-

guity found when contract for fencing required a type of lumber only available in a size that could not be used to make the size of fencing slats specified).[3]

## CONCLUSION

Accordingly, based on the foregoing, defendant's motion for partial summary judgment is granted only with respect to Rentenbach's and Swift's claims relating to providing double roofing and is otherwise denied.

A status conference shall be held at 2:30 p.m. on Thursday, February 20, 1992, in the National Courts Building. Plaintiffs may participate by telephone conference call to be placed by the court. The parties shall be prepared to discuss the progress of their settlement meetings held in January and to propose a course of further proceedings.

---

**3.** During argument plaintiff noted that discovery would reveal that all the bidders bid on a single course of aggregate, so that the ambiguity should not be considered patent. This argument was not prompted by defendant's reply, but by defendant's opening brief. The latter was the occasion for plaintiff to exercise its right to discovery pursuant to RUSCC 56(f).

*See New America Shipbuilders, Inc. v. United States,* 871 F.2d 1077, 1081 (Fed.Cir.1989); *Dunkin' Donuts of America, Inc. v. Metallurgical Exoproducts Corp.,* 840 F.2d 917, 919 (Fed.Cir. 1988); *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1566–67 (Fed.Cir.1987). Plaintiff has waived that right.