**DAIRYLAND POWER COOPERATIVE, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 91–1676C.**

United States Court of Federal Claims.

March 19, 1993.

Charles C. Thebaud, Jr., Washington, DC, with whom was John C. Person, for plaintiff.

Anthony J. Ciccone, Washington, DC, with whom was Asst. Atty. Gen. Stuart M. Gerson, David M. Cohen, and Terrence S. Hartman, Marc Kasischke, and Gregory Wojciechowski, U.S. Dept. of Energy, Washington, DC, of counsel.

## ORDER

MOODY R. TIDWELL, III, Judge:

This case is before the court on defendant's motion to dismiss for failure to state a claim, or, in the alternative, for summary judgment, and on plaintiff's cross-motion for summary judgment. Plaintiff seeks damages in excess of $97 million. For the reasons set forth below, the court grants defendant's motion for summary judgment, and denies plaintiff's cross-motion for summary judgment.

## FACTS

### I. Operation and Sale of the LaCrosse Boiling Water Reactor

On June 6, 1962, the United States Atomic Energy Commission (AEC), predecessor agency to the United States Department of Energy (DOE),[1] and Dairyland Power Cooperative (DPC or plaintiff) executed contract number AT(11–1)–851 (the 1962 contract), subsequently redesignated DE–AC02–76ET37231. This contract was entered into in accordance with the Cooperative Power Reactor Demonstration Program, Pub.L. No. 87–315, § 109, 75 Stat. 679 (1961). Accord Pub.L. No. 85–162, § 111, 71 Stat. 409 (1957).

The 1962 contract required the AEC to construct a 50–megawatt boiling water nuclear reactor plant in the town of Genoa, near LaCrosse, Wisconsin, upon land provided by DPC. The reactor plant is sometimes referred to as the LaCrosse Boiling Water Reactor (LACBWR). The 1962 contract also required DPC to operate and maintain the reactor plant and an adjacent generator plant, and to purchase all steam produced by the reactor plant. The LACBWR achieved initial criticality on July 11, 1967. DPC operated the LACBWR from November 1, 1969, when the AEC accepted the facility from the firm which had constructed it, until DPC permanently shut it down on April 30, 1987. The reactor plant was placed in commercial operation by DPC on February 1, 1971.

The 1962 contract provided for a ten-year operating period which, by agreement of the parties, began November 1, 1969. The

---

1. The Department of Energy (DOE) is the successor agency to the Atomic Energy Commission (AEC) with respect to the contract at issue here. See Energy Reorganization Act of 1974, Pub.L. No. 93–438, 88 Stat. 1233; The Department of Energy Organization Act, Pub.L. No. 95–91, 91 Stat. 565 (codified at 42 U.S.C. § 7151 (1988)).

AEC was obligated, under the agreement, to offer to sell to DPC the reactor plant upon the expiration of this ten year term; at its option, the AEC could chose to offer it for sale after November 1, 1974. Article III of the 1962 contract expressly contemplated the sale of the LACBWR to DPC, providing, in pertinent part, as follows:

Upon expiration of the period of contract operation the [AEC] will, or during the preceding five-year period the [AEC] may, offer to sell the Reactor Plant to [DPC].... [If certain conditions are met, DPC] will purchase the Reactor Plant and this contract shall thereupon expire. In such event, the purchase price for the reactor plant shall be the cost of construction ... less appropriate depreciation....

Upon expiration or termination of this contract, if [DPC] does not purchase the reactor and its appurtenances, the [AEC] may dismantle the reactor ... or the [AEC] may ... abandon ... the Reactor Plant ... and shall be under no obligation to restore [DPC]'s premises to their original condition or defray the expense of such restoration provided that the [AEC] will take such action as it may deem necessary within a reasonable time after abandonment to make the reactor site safe from the public health and safety standpoint.

In 1971 and 1972, the AEC and DPC conducted negotiations with respect to the early sale of the reactor plant. These negotiations culminated in an agreement in principle to sell the reactor, including two nuclear fuel cores, to DPC for an amount in excess of two million dollars.[2] However, the transfer of the reactor to DPC was not effected upon the foregoing terms, as DPC felt that it had underestimated the costs of obtaining a full-term license to operate the plant. DPC therefore declined to execute the proposed sale agreement.

After further negotiations, the AEC agreed to transfer the reactor plant, two fuel cores, and spare parts to DPC for one dollar. This reduction in consideration was the only "substantive difference" between the current and previous proposed sale agreements. *Proposed Sale of La Crosse Boiling Water Reactor to Dairyland Power Cooperative: Hearing Before the Joint Committee on Atomic Energy*, 93d Cong., 1st Sess., at 3 (1973) [hereinafter the JCAE Hearing Report]. That is, the remaining principles of agreement between the parties remained constant. In connection with the approval of the revised transaction, the report of the Joint Committee on Atomic Energy (JCAE) contained the following statements:

The terms of the proposed sale are clearly less attractive to the Government than those of the previous arrangement....

The principal advantage to the Government from this sale would be that it would be relieved of the financial responsibility under the contract for the cost of operating and possibly decommissioning a reactor which has no further programmatic value....

The economic value of the plant to [DPC] depends upon how well the plant operates, for how long, and efficiencies and economies that can be effectuated by [DPC] in its operation. If the plant, as presently staffed and supported, operates well ... its economic value compared to that of a fossil-fueled plant of similar size is marginal. However, if DPC could reduce operating costs ... this would represent a present economic value of about $3.5 million which would be essentially offset by the initial cost to DPC of about $2.7 million for plant modifications to enable it to obtain a full operating license. Accordingly, for $1.00, DPC would obtain reactor fuel having a present value of approximately

---

**2.** Among the "Principles of Agreement" for the sale of the LaCrosse Boiling Water Reactor (LACBWR) to Dairyland Power Cooperative (DPC) were that DPC was to bear the responsibility and expense of reprocessing current and future spent fuel cores. *See also Proposed Sale of LaCrosse Boiling Water Reactor to Dairyland*

*Power Cooperative: Hearing Before the Joint Committee on Atomic Energy*, Appendix 1, 93d Cong., 1st Sess., at 15 (1973) (Letter from AEC General Manager R.E. Hollingsworth to Hon. John O. Pastore, Chairman, Joint Committee on Atomic Energy) [hereinafter the JCAE Hearing Report].

$5 million and a reactor with presently marginal or doubtful value, but with the optimistic expectation that some operating economies could be achieved. But DPC, by purchasing the reactor ... is giving up the rights it has under the existing contract for an additional one or possibly six years in which to demonstrate the plant's reliability and economics. If risks do materialize, the economic value of the reactor could be reduced practically to zero.

*Id.* at 33–34, Supplemental Appendix 2 (Memorandum from Edward J. Bauser, Executive Director, to all Committee Members).

It was also established during the JCAE hearings that (1) DPC viewed its purchase of the reactor as "a calculated risk, a gamble, if you will, that [DPC] can make this plant perform economically for [DPC's] power system," *id.* at 7; (2) the AEC would indemnify DPC up to $1 million for the cost of decommissioning the LACBWR "[i]f the plant goes completely sour before November 1974," *id.* at 8–9; (3) DPC felt that in the event the LACBWR didn't run effectively and "went sour" after November 1974, it "[would be] in a financial position to decommission the plant and to keep it in proper security," *id.* at 9; and (4) the value of the reactor at the time of the hearings was about $10 million. *Id.* at 10. The foregoing congressional analysis concluded that, "[i]n view of the ... risks assumed by the DPC under the terms of the proposed sale, the sale ... would not appear to result in a windfall to DPC." *Id.* at 34, Supplemental Appendix 2.

Three days after the August 3, 1973, congressional hearing upon the proposed reactor sale, the AEC and DPC executed a formal contractual modification to the 1962 contract—designated "Modification No. 15," executed August 6, 1973 (the 1973 contract)—agreeing to transfer title in the reactor plant, two fuel cores, and spare

parts to DPC for one dollar. The 1973 contract provides, in pertinent part:

RECITALS

... This supplemental agreement modifies the contract [AT(11–1)–851] to provide for the sale as agreed upon by the parties and sets forth the terms under which title to the reactor plant will transfer to [DPC] coincident with the issuance of a provisional operating license.

. . . .

AGREEMENT

NOW THEREFORE, the parties hereto mutually agree that notwithstanding any provisions of Contract AT(11–1)–851 as previously amended to the contrary, the [AEC] agrees to sell and [DPC] agrees to purchase the reactor plant, the two fuel cores and their spares currently at the reactor site, spare parts, [and] operating supplies ... subject to and in accordance with the following terms and conditions.

I. UNDERTAKINGS OF THE CONTRACTOR

. . . .

2. In consideration for the conveyance by the [AEC] of title to the reactor plant, fuel cores and other [AEC] property to [DPC], and assumption by the [AEC] of the obligations under Paragraph II hereof,[3] [DPC] agrees that the [AEC], its successors and assigns shall not thereafter be obligated to [DPC] for any further claims, charges or demands whatsoever, under or pursuant to Contract AT(11–1)–851, or otherwise, and shall be relieved of all further obligations and responsibilities with regard to the reactor plant. [DPC] agrees to accept such conveyance of title and shall pay to the [AEC] the sum of one dollar ($1.00).

. . . .

IV. CONTINUING APPLICABILITY OF CONTRACT AT (11–1)–851

1. It is understood and agreed by the parties that until the sale of the reactor plant is consummated and title trans-

---

**3.** Paragraph II of the August 6, 1973, reactor sale contract (the 1973 contract) dealt with specified situations under which the AEC would compensate DPC for losses or repairs in connection with the operation of the LACBWR, should

these contingencies occur within a specified period of time. None of the enumerated contingencies addressed the disposal of spent nuclear fuel, the subject of the parties' present dispute.

ferred to [DPC] as provided in this Supplemental Agreement, Contract AT(11-1)–851 shall be and remain in full force and effect. Upon such sale and transfer of title as herein provided[,] Contract AT(11–1)–851 shall thereupon cease to be effective and neither [DPC] nor the Government shall thereafter have any further rights or obligations thereunder; provided, however, that nothing in this paragraph shall in any way relieve either party of any obligation or responsibility specifically undertaken or assumed under this Supplemental Agreement in connection with or in consideration of the said sale.

(footnote added).

The AEC granted DPC a provisional operating license for the reactor plant on August 28, 1973. DPC applied for a full-term operating license on October 9, 1974, but such license was never received.[4] As stated above, DPC permanently shut down the LACBWR on April 30, 1987.

## II. *Disposal of Spent Nuclear Fuel*

According to a 1982 House Report on the Nuclear Waste Policy Act of 1982 (NWPA), it was not until the 1960s that the AEC began to address the need for disposal of spent nuclear fuel. *See* H.R. REP. No. 491, 97th Cong., 2d Sess., pt. 1, at 26–28 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3792, 3792–94. The AEC hurried to develop permanent waste disposal facilities in the early 1970s, but sites chosen were rejected. During the same period, the nuclear power industry either stored its spent fuel or relied on the nascent commercial reprocessing[5] industry for its disposal needs. However, commercial reprocessing never developed into a viable industry for a variety of regulatory and economic reasons.

At the time of the August 6, 1973, reactor sale, the only licensed commercial nuclear fuel reprocessing plant in the United States was operated by Nuclear Fuel Services, Inc. (NFS). However, NFS had suspended the reprocessing of spent nuclear fuel by then. At least three other facilities were in the process of construction, or were planned. By 1976, all operational reprocessing plants were retired, and construction of incomplete facilities was cancelled.

On October 18, 1973, DPC solicited proposals for the transportation and reprocessing of existing and future LACBWR spent nuclear fuel. On March 11, 1974, DPC accepted the offer of NFS to provide storage and reprocessing. In a July 13, 1976, letter from NFS to DPC, NFS advised that the earliest date for resuming reprocessing would be 1988, due in part to regulatory requirements for increased seismic protection measures at the reprocessing facility. NFS thus invoked a section of the NFS–DPC March 14, 1975, contract providing the parties with the opportunity to terminate or modify their contract in order to respond to regulatory changes. On September 15, 1976, NFS advised DPC that it was "agreeable to terminating the fuel reprocessing portion of the contract and continuing its commitment to reserve 40 storage positions ... for storage of [the LACBWR] spent fuel," subject to certain conditions. DPC agreed to this modification of its contract with NFS. Subsequently, in a December 6, 1977, letter to NFS, DPC terminated the entire March 14, 1975, contract between itself and NFS, including the September 15, 1976, modification.

On April 7, 1977, President Carter issued a statement about the commercial reprocessing of spent nuclear fuel to extract plutonium, uranium, and other fissionable

---

**4.** In 1977, the United States Nuclear Regulatory Commission (NRC) initiated the Systematic Evaluation Program (SEP) to review the design of older nuclear power plants, of which the LACBWR was one, in order to reconfirm and document their safety. The issuance of a full-term operating license was tied to the completion of the SEP safety assessment, and the plant's conformance with NRC safety standards. Because DPC had not completed the work nec-

essary to bring the LACBWR into compliance with the SEP prior to the April 30, 1987 shut down, it never received the full-term operating license for the plant.

**5.** Reprocessing is a process by which useful nuclear materials in spent fuel—namely uranium and plutonium—are extracted for conversion into additional reactor fuel.

elements, explaining that the United States would suspend indefinitely commercial reprocessing due to the risks to world peace inherent in such an industry. On October 8, 1981, President Reagan lifted the ban on commercial reprocessing. The reprocessing industry, however, never resumed development.

In January 1983, Congress passed the NWPA which provided for the permanent disposal of spent nuclear fuel from commercial nuclear power plants in federal storage repositories. *See* Nuclear Waste Policy Act of 1982, Pub.L. No. 97–425, 96 Stat. 2201 (1983) (codified at 42 U.S.C. §§ 10101–10226 (1988)). Under this program, commercial parties contract with DOE for the permanent storage of the fuel cores used at their reactor plants, pursuant to standard disposal contracts. As of 1989, DOE estimated the projected start of federal repository operations to be 2010.

In 1971, using AEC published prices, DPC estimated the value of the LACBWR spent fuel cores—later purchased from the AEC in 1973—as between $2.6 and $5 million. This estimate was based on the value of the useful materials remaining in the spent fuel, less the costs of reprocessing. On August 3, 1973, the AEC estimated the value of the existing LACBWR spent fuel cores at $5.2 million, based on the same factors. Neither the 1962 construction contract, nor the 1973 reactor sale contract contained an express governmental guarantee that the nuclear fuel transferred to DPC could or would be commercially reprocessed, to DPC's financial benefit, or that commercial reprocessing would be available throughout the operating life of the LACBWR and any subsequent decommissioning period. In fact, neither agreement

contained any discussion of any method of spent nuclear fuel disposal.

### III. *Plaintiff's Initial Claim*

In October 1990, DPC submitted an initial claim based on the 1973 reactor sale agreement pursuant to the Contract Disputes Act. On December 10, 1990, the DOE Contracting Officer denied the claim without issuing a decision, determining that the claim was not cognizable under the Contract Disputes Act. The Contracting Officer stated that because the 1973 contract had been fully performed, and because DPC had executed the above-detailed release as well as a subsequent settlement agreement, there was no contract existing on which to base a claim.

DPC resubmitted its claim to the Contracting Officer in May 1991. DPC later asked the Contracting Officer to delay issuing a final decision in order to allow DPC to submit additional documentation which it was to receive as the result of a May 1991 Freedom of Information Act request. DPC submitted the additional documentation on September 18, 1991. DPC instituted this action in the United States Claims Court[6] on December 9, 1991, before the issuance of the Contracting Officer's final decision upon its October 1990 claim, as resubmitted on May 1, 1991, and supplemented on September 18, 1991.

### DISCUSSION

### I. *Jurisdiction*[7]

This action arises out of an express contract between DPC and the United States (acting through the AEC), under section 10(a)(1) of the Contract Disputes Act of 1978, 41 U.S.C. § 609(a)(1) (1988), and the Tucker Act, 28 U.S.C. § 1491(a)(2) (1988).

---

6. The Federal Courts Administration Act of 1992, Pub.L. No. 102–572, 106 Stat. 4506, enacted on October 29, 1992, altered the name of the United States Claims Court to the United States Court of Federal Claims. The United States Court of Federal Claims is the successor to the United States Claims Court in all respects.

7. Defendant has assumed, for the purposes of this motion, without conceding, that plaintiff has met the necessary jurisdictional prerequisites to maintaining an action here, such as that

the involved contract and claim are subject to the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613, and that the action was filed within the Tucker Act's six-year statute of limitations, 28 U.S.C. § 2501. Defendant reserves the right to file a motion to dismiss under RCFC 12(b)(1). Because defendant has not raised these jurisdictional issues as defenses, the court declines to pass on them, and likewise assumes that jurisdiction is proper.

## II. *Summary Judgment Standard*

This case is before the court on defendant's motion to dismiss under RCFC 12(b)(4), or, in the alternative, for summary judgment under RCFC 56. Because materials outside the pleadings were presented to and considered by the court, the court will treat defendant's motion to dismiss as a motion for summary judgment. *See* RCFC 12(b)(4).

▓▓▓ Summary judgment is properly granted when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir. 1987) (citing *Armco, Inc. v. Cyclops Corp.*, 791 F.2d 147, 149 (Fed.Cir.1986)). In considering a motion for summary judgment, the evidence must be viewed, and inferences drawn, in a light most favorable to the non-moving party. *Litton Indus. Prod., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985); *D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d 1144, 1146 (Fed.Cir.1983).

## III. *The Parties' Claims*

▓▓▓ DPC claims that it is entitled to rescission of the 1973 LACBWR sale contract based on the theories of commercial impracticability, frustration of purpose, and mutual mistake. DPC seeks rescission [8] and related costs, or, alternatively, damages exceeding $97 million in order to pay for all aspects of the decommissioning of the LACBWR.

Defendant, in response, argues that (1) DPC has failed to state a claim upon which relief can be granted as DPC executed several releases discharging defendant from all liability in connection with the LACBWR sale; (2) rescission is unavailable because the sale contract has been fully performed; (3) reformation is unavailable because the parties were not mutually mistaken about an underlying contractual

premise; (4) commercial impracticability, impossibility, and frustration of purpose are unavailable where the contract has been fully performed; (5) defendant cannot be liable to DPC where the acts taken to halt the commercial reprocessing industry were undertaken by defendant in its capacity as sovereign; (6) plaintiff's action is barred by laches; and (7) the damages sought by plaintiff are remote and speculative, and as such are beyond this court's power to award. As the court finds that defendant is entitled to judgment as a matter of law upon the first and third arguments, it need not reach the remaining five grounds offered for summary judgment.

## IV. *DPC's Action is Barred by its Execution of a Release*

▓▓▓ As a general rule, the execution of an unrestricted release, pursuant to a government contract, bars the later assertion of claims against the government with respect to that contract. *Mingus*, 812 F.2d at 1391–92; *J.G. Watts Constr. Co. v. United States*, 161 Ct.Cl. 801, 805 (1963) (citations omitted); *A & A Insulation Contractors, Inc. v. United States*, 26 Cl.Ct. 371, 373 (1992) (citing *Gresham, Smith & Partners v. United States*, 24 Cl.Ct. 796, 801 (1991)); *Clark Mechanical Contractors, Inc. v. United States*, 5 Cl.Ct. 84, 87 (1984). If a contractor wishes to preserve a right to assert a claim under that contract later, it bears the burden to modify the release, before signing it. *Mingus*, 812 F.2d at 1393–94. "Exceptions to releases of claims are strictly construed against government contractors," *Gresham, Smith & Partners v. United States*, 24 Cl.Ct. 796, 801 (1991) (citing *Mingus*, 812 F.2d at 1394) and "a 'blunderbuss exception' which does nothing to inform the government as to the ... contractor's specific contentions" will not suffice. *Mingus*, 812 F.2d at 1394. There are, however, "limited situations in which a claim may be prosecuted despite the execution of a general release": "where it is shown that, by reason of a

---

8. The court notes that the employment of equitable doctrines such as rescission and reformation is beyond this court's jurisdiction unless

directly "incident to a money judgment." *Hartle v. United States*, 22 Cl.Ct. 843, 845–46 n. 5 (1991).

mutual mistake, neither party intended that the release cover a certain claim, the court will reform the release." *J.G. Watts*, 161 Ct.Cl. at 806 (citations omitted). The release is a contractual provision, and its interpretation is a matter of law. *Gresham*, 24 Cl.Ct. at 801 (citations omitted).

### A. General Release

■ When DPC executed the 1973 reactor sale contract, it executed a release of all claims against the government save a specified few in connection with the sale of the reactor and the 1962 contract. None of these exceptions to the release are at issue here. The release language contained in the 1973 contract therefore bars plaintiff's claim.[9] In executing the 1973 reactor sale contract, DPC agreed—in consideration of the AEC's conveyance of title, and the AEC's incurring certain contingent liabilities toward DPC in the event of an early plant failure—that the AEC "[would] not thereafter be obligated to [DPC] for any further claims, charges, or demands . . . and [would] be relieved of all further obligations and responsibilities with regard to the reactor plant."

### B. Exceptions

DPC bargained for specific exceptions to its release of the government, but liability for disposal of spent nuclear fuel was not one of these exceptions. Moreover, the 1973 contract specified that consummation of the reactor sale, which occurred when the AEC granted DPC its provisional operating license on August 28, 1973, extinguished the 1962 contract. DPC undertook the burden and liabilities attendant to decontamination and decommissioning of the LACBWR, including the disposal of spent nuclear fuel, upon taking title to the reactor.

### C. Mutual Mistake With Respect to the Release

■ The release contained in the 1973 contract was an essential part of the bargain struck by the parties for the sale of the reactor plant. While the AEC agreed to sell the reactor, fuel, and appurtenances to DPC for one dollar, it was clear to all that DPC's purchase was a calculated risk, for which the AEC declined to assume unlimited liability. DPC does not allege that the parties were mutually mistaken about the extent of coverage of this release language. It does, however, allege that it did not intend to exclude the liability at issue from the release. To the extent that this is a mistake, it is unilateral, as there is no evidence that the AEC intended to retain this liability. Reformation is not available to correct a unilateral mistake. *See J.G. Watts*, 161 Ct.Cl. at 806–07. This is not a situation, then, justifying reformation of the release language because of mutual mistake, as contemplated in *J.G. Watts*.

DPC's lawsuit thus falters upon the 1973 contract's express and binding release. DPC agrees that the 1973 contract "can bar [its] claim . . . if the LACBWR Sale Agreement [*i.e.*, the 1973 contract] withstands scrutiny" against DPC's claims of commercial impracticability, frustration of purpose, and mutual mistake. This, the 1973 contract does do. The court therefore concludes that as a matter of law, DPC has failed to state a claim upon which relief can be granted.

### V. Lack of Mutual Mistake of Fact; Rescission and Reformation Unavailable as a Matter of Law

Even assuming that the release executed in 1973 was not effective, rescission and reformation are unavailable here as a matter of law where the parties did not make a mutual mistake of fact, and where DPC assumed the risk of mistake.

### A. Mutual Mistake

■ As the United States Court of Appeals for the Federal Circuit recently reiterated, the narrow "purpose of reforming a contract on the basis of mutual mistake is to make a defective writing conform to the

---

**9.** As the 1973 reactor sale contract provides that upon consummation of the sale of the reactor, the 1962 contract expires and ceases to be effective, the court need not address the effect of subsequent "releases" agreed upon by the parties.

agreement of the parties upon which there was a meeting of the minds." *Emerald Maintenance, Inc. v. United States*, 925 F.2d 1425, 1429 (Fed.Cir.1991); *accord National Presto Indus., Inc. v. United States*, 167 Ct.Cl. 749, 338 F.2d 99, 106–07 (1964), stating that "[e]xcept where the parties have failed to conform the written instrument to their actual understanding ... courts ... have been wary in granting relief from ... mutual mistakes...." (citations omitted). Consequently, a plaintiff must, at a minimum,

> allege four elements: (1) the parties ... were mistaken in their belief regarding a fact; (2) that mistaken belief constituted a basic assumption underlying the contract; (3) the mistake had a material effect on the bargain; and (4) the contract did not put the risk of the mistake on the party seeking reformation.

*Atlas Corp. v. United States*, 895 F.2d 745, 750 (Fed.Cir.1990) (citations omitted). Moreover, plaintiff has the burden of proving mutual mistake. *Hartle v. United States*, 22 Cl.Ct. 843, 847 (1991). The court finds that plaintiff cannot establish mutual mistake of fact because it bore the risk of mistake under the contract.[10]

### B. *DPC Bore the Risk of Mistake*

 The fourth element of the test for mutual mistake is whether the party seeking relief bore the risk of mistake. This directly corresponds to the limited nature of the remedy of reformation, which seeks merely to reflect the parties' true intent, not impose an agreement upon them to which they did not assent. The remedy of rescission is likewise limited to situations where it is possible to return the parties to the *status quo ante*, and where the contract has not yet been fully performed. *See Adler Constr. Co. v. United States*, 191 Ct.Cl. 607, 423 F.2d 1362, 1366 (1970); *Chernick v. United States*, 178 Ct. Cl. 498, 372 F.2d 492, 496 (1967).

> [A] mutual mistake as to a fact ..., even a material one, will not support relief if the contract puts the risk of such a mis-

take on the party asking reformation ... or normally if the other party, though made aware of the correct facts, would not have agreed at the outset to the change now sought....

*Flippin Materials Co. v. United States*, 160 Ct.Cl. 357, 312 F.2d 408, 415 (1963) (citations omitted).

It is certain that DPC bore the risk of mistake. That is, DPC undertook the risks that commercial reprocessing would not be available, that it would not realize the financial gain it expected to receive from the extraction of uranium and plutonium, and that it would bear the (increased) expense of otherwise disposing of or storing the spent fuel generated. That DPC assumed these risks is clear to the court for several reasons.

#### 1. Ability to Draft Exceptions to Release

The parties decidedly allocated the risks associated with operating the LACBWR in Paragraph II of the 1973 contract. DPC released the AEC from all liability attendant to the operation of the reactor plant, save under a few specified circumstances. DPC contends that the parties only allocated risk with respect to the plant's *operation* and did not address the fuel cores, thus, the contract could not have placed the risk of mistake as to the failure of commercial reprocessing upon DPC. This is not so. That the parties spelled out several exceptions to the release shows that they were capable of formulating and documenting exceptions dealing with various contingencies. In fact, one of these exceptions allowed for up to a $1 million contribution by the AEC towards decommissioning costs should the LACBWR be shut down prior to November 1974.

The parties had obviously discussed what DPC intended to do with the spent fuel cores. *See* JCAE Hearing Report, at 15, Appendix 1. As such, they could have drafted a provision addressing liability as to the spent fuel. The parties recognized that the probability of occurrence of the

---

**10.** The court need not apply the remaining three elements set forth in *Atlas Corp. v. United States*, 895 F.2d 745, 750 (Fed.Cir.1990) to the facts at bar as plaintiff fails the fourth element necessary to show mutual mistake of fact.

exceptions to the release was remote. They must have considered the possibility of the commercial reprocessing industry's demise equally remote.[11] They could certainly have drafted a provision covering this "remote" contingency, had they desired to do so. Had the parties intended for the AEC to guarantee that reprocessing would continue to be available throughout the operating and decommissioning period of the LACBWR, or had they intended for the AEC to indemnify DPC should it incur unexpected costs due to the unavailability (temporary or otherwise) of reprocessing, they would have drafted a provision as an exception to the release clause.

The lack of an express exception from release of liability in light of other express exceptions leads the court to conclude that the parties intended as part of the consideration for the one dollar sale that DPC bear the risks attendant to the production of spent nuclear fuel. Therefore, the court finds that the parties did contractually address the risks associated with spent nuclear fuel through their execution of Paragraph II of the 1973 contract.

### 2. The LACBWR Project was a Risky Investment

The court finds that DPC bore the risk of mistake as the parties knew of the LACBWR's marginal economic benefit at the time of contracting. It is clear from the JCAE Hearing Report that the AEC intended to be relieved of the financial burden of owning the reactor. *Id.* at 34, Supplemental Appendix 2. The JCAE Hearing Report also indicates that both parties faced economic uncertainties inherent in owning the reactor. *Id.* DPC expected to receive economic benefit from the spent fuel cores it purchased along with the plant. Presumably, though, it did not purchase the plant in order to fabricate spent nuclear fuel which could then be reprocessed; it purchased the plant in order to provide its customers with a low-cost source of electricity. In order to do so, it was necessary for DPC to undertake the

responsibility for dealing with the nuclear reactor's by-product: spent fuel. In sum, it is incontestable that DPC was investing in a risky project from which it expected, but was not guaranteed, financial gain.

### 3. AEC Would Not Have Agreed to the Changes Sought Here

DPC bore the risk of mistake because the AEC would not have altered the 1973 contract had the facts now known been known at the time of contract. *See Flippin*, 312 F.2d at 415; *Edwards v. United States*, 19 Cl.Ct. 663, 674 (1990) (citing *National Presto*, 338 F.2d at 108). It is unbelievable that the AEC would have agreed to indemnify DPC for its storage and decommissioning costs had it known of the demise of the reprocessing industry and the storage costs subsequently incurred by DPC. It is likely that under such circumstances, the AEC would have shut down the LACBWR, inasmuch as the reactor was already of slight programmatic value by 1973.

### 4. Allocation of Risk Upon DPC is Appropriate

Even had the parties not contractually addressed the risks associated with such an uncertain investment, it would be reasonable for the court to so allot the risk of mistake upon DPC. *See* Restatement (Second) of Contracts § 154 (1981). Where, as here, the AEC expressly limited its liability to DPC in connection with this one dollar reactor sale, DPC's risks should be borne by the rate-payers who benefitted from the low-cost electricity produced by the reactor rather than by the taxpayers at large. *See Florida Power & Light Co. v. Westinghouse Elec. Corp.*, 826 F.2d 239, 279 (4th Cir.1987), *cert. denied*, 485 U.S. 1021, 108 S.Ct. 1574, 99 L.Ed.2d 890 (1988).

For these reasons, DPC bore the risk of mistake with respect to the availability of commercial reprocessing, and thus cannot establish a mutual mistake of fact. Because DPC cannot establish a mutual mis-

---

11. During the time of the reactor sale agreement negotiations, both parties knew that only one reprocessing facility was operational; both knew that NFS had deferred reprocessing; both could have contemplated that the industry might fail, however remote they considered this possibility to be.

take of fact, neither rescission nor reformation are available remedies. *See Hartle*, 22 Cl.Ct. at 847. The court has no jurisdiction to write contracts or clauses by means of reformation where there has been no agreement. *American President Lines, Ltd. v. United States*, 821 F.2d 1571, 1582 (Fed.Cir.1987).

## CONCLUSION

The court finds that because plaintiff executed a valid release, its claim is barred as a matter of law; plaintiff failed to state a claim upon which relief can be granted. Moreover, the remedies of rescission and reformation are unavailable as a matter of law because there was no mutual mistake of fact. The court, therefore, grants defendant's motion for summary judgment, and denies plaintiff's cross-motion for summary judgment. The Clerk of the court is directed to enter judgment in favor of defendant. No costs.

IT IS SO ORDERED.